CHRISTINA HINES, ADMINISTRATRIX (ESTATE OF
JESSICA L. HINES) *v.* SAINT VINCENT'S
MEDICAL CENTER
(15113)

BORDEN, BERDON, NORCOTT, KATZ and PALMER, Js.

Argued January 13—decision released April 11, 1995

*Joram Hirsch,* with whom, on the brief, were *Robert B. Adelman* and *Jeffrey S. Wildstein,* for the appellant (plaintiff).

*Patricia A. Carpenter,* with whom, on the brief, was *Sarah S. Oldham,* for the appellee (defendant).

BERDON, J. The sole issue in this appeal is whether the trial court was correct in refusing to instruct the jury that an adverse inference could be drawn from the defendant's failure to call a witness to testify.[1] The

___

[1] See *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 165 A.2d 598 (1960).

plaintiff, Christina Hines, is administratrix of the estate of her deceased daughter, Jessica Hines.[2] She commenced this medical malpractice action against the defendant, Saint Vincent's Medical Center (hospital), for damages as the result of Jessica's death. The jury returned a verdict in favor of the hospital. The plaintiff moved to set aside the verdict, but the trial court denied this motion. The plaintiff appealed to the Appellate Court and the case was transferred to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The facts necessary to decide the issue on appeal are not in dispute. The plaintiff gave birth to a daughter, Jessica Lynn, on March 3, 1987, at the hospital. Four days later, mother and daughter were discharged from the hospital. On March 11, however, Jessica became ill, and her parents, the plaintiff and her husband, George Hines, returned to the hospital.

Jessica's parents first were interviewed by Belinda Saxon, a register clerk in the emergency room. Saxon solicited information from the family, including the baby's name, address and insurance information. Saxon also engaged in a brief discussion about Jessica's health, and why the family had taken her to the hospital. Saxon recorded this information on a medical record that she established for Jessica, which the plaintiff then signed. This record reflected the plaintiff's statement to Saxon that Jessica's medical problem was "swollen stomach, twice stop breathing."

[2] The action was filed by two plaintiffs: Christina Hines in her capacity as administratrix of the estate of her daughter, and Christina Hines in her individual capacity. The complaint, however, states a cause of action only in her capacity as administratrix. Our references herein to "the plaintiff," however, also include Christina Hines as the mother of Jessica Hines.

The plaintiff[3] next took the baby to meet a triage nurse, Kathy Martin,[4] who interviewed the family and inquired about the nature of the baby's illness. After the nurse conducted this interview, the baby was examined by a physician, Gerald Golding, and a second nurse, Dawn Martin. Golding diagnosed the baby as suffering from constipation and discharged her from the hospital's care. Her parents took Jessica home with them that night. The following morning, March 12, 1987, Jessica's parents found her dead in her crib. An autopsy revealed that the baby had died from "a massive bacterial meningitis (Streptococcus) complicated by acute pneumonitis, pulmonary congestion and edema."

At trial, the parties called witnesses to testify about what had occurred at the hospital during the evening of March 11, 1987, when Jessica's parents brought her to the emergency room. The plaintiff called as witnesses herself and Golding, the doctor who had examined Jessica. The defendant hospital called as witnesses the triage nurse, Kathy Martin, and the second nurse who had been present during the doctor's examination, Dawn Martin. The court also admitted into evidence the medical record that Saxon, the register clerk, had prepared. Neither party, however, called Saxon to testify.

Before the close of the plaintiff's case, the plaintiff informed the court and the hospital that, if the hospital did not call Saxon to testify, the plaintiff would ask

[3] The plaintiff and her husband had borrowed a car to go to the hospital, and George Hines needed to return the car while Jessica was being treated at the hospital. He therefore was not present at all times during the hospital visit.

[4] A triage nurse, according to Martin, "is the first person that the patient usually sees upon arriving to the [emergency room]. They do a brief assessment of the patient and decide who can go in first, who can wait, who is more critical. You have to kind of prioritize the patients that come through the door."

the court to instruct the jury that it could draw an adverse inference from the hospital's failure to call Saxon as a witness.[5] Before the close of the defendant's case, the defendant asked the court to rule on whether it would issue such an instruction, but the court reserved decision on the matter until both sides had rested. The hospital did not call Saxon as a witness before resting its case. The plaintiff thereafter submitted a supplemental request to charge, seeking to have the court instruct the jury that it could infer that, because the hospital had failed to call Saxon to testify, her testimony would have been unfavorable to it.[6]

---

[5] Connecticut has abandoned the common law "voucher rule," which stated that a party "vouched" for the credibility of his or her witness and, consequently, would not be allowed to impeach the witness. *State* v. *Graham*, 200 Conn. 9, 17, 509 A.2d 493 (1986) ("[w]e are persuaded by the weight of authority that there is no longer justification for the common law rule prohibiting a party from impeaching his own witness"); see General Statutes § 52-178; see also C. Tait & J. LaPlante, Connecticut Evidence (Sup. 1994) § 11.5.4, p. 151 ("[t]he rule originated at a time when parties 'vouched' for the veracity of their witnesses so that an opponent dared not call an adverse witness"). The plaintiff, therefore, could have called Saxon to testify without vouching for her credibility.

[6] The plaintiff sought to have the court instruct the jury as follows: " 'In the course of the argument of this case, attention was called to the failure to call certain witnesses who it was claimed might by their testimony have thrown light on the situation before you. Where a party fails to call to the stand a witness who is within his power to produce and who would naturally have been produced by him, you are entitled to infer that had she testified, that testimony would have been unfavorable to the party failing to call her, and to consider that fact in arriving at your decision.

" 'There are two requirements for the operation of this rule: (1) the witness must be available, and (2) she must be a witness whom the party would naturally produce. A witness who would naturally be produced by a party is one who is known to that party and who, by reason of her relationship to that party, or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case, which, if favorable, the party would produce.' . . .

"The evidence indicates that on March 11, 1987, Belinda Saxon, who was the defendant's employee at the time, was the receptionist who took Mrs. Hines' initial complaint and started the chart. Nurse Martin has testified that Mrs. Saxon still works at St. Vincent's Medical Center and the

During a conference in chambers prior to delivering the jury charge, the court informed both parties that it would not deliver the adverse inference instruction because Saxon had been equally available as a witness to both parties.[7] After the court delivered the jury charge without the requested instruction, the plaintiff took exception to the charge as given. The jury thereafter returned a verdict in favor of the hospital.

The plaintiff moved to set aside the jury verdict, arguing that the trial court should have issued the adverse inference instruction. In an oral decision, the trial court found that Saxon was not a witness who would naturally have been produced by the hospital. The court concluded that, because Saxon had failed to satisfy that part of the test for the instruction on adverse inferences, such an instruction would have been inappropriate. The trial court, therefore, denied the motion to set aside the verdict and rendered judgment for the hospital on the verdict. This appeal followed.

On appeal, the plaintiff argues that the trial court acted improperly in two ways. First, the plaintiff argues that the trial court should not have refused to instruct the jury on an adverse inference merely because Saxon was equally available as a witness for either party. Second, the plaintiff argues that the trial court incorrectly

parties have stipulated that Mrs. Saxon was under subpoena and available to testify in this case.

"Belinda Saxon is a witness whom the defense would naturally be expected to produce to rebut the plaintiff's contention that her initial complaint included the fact that her baby had stopped breathing and to support the defendant's version of Mrs. Hines' complaint when she entered the emergency room. I charge you that since the defense did not call Mrs. Saxon to testify, you may infer the reason she was not called was because her testimony would have been unfavorable to the defense. . . . *Secondino* v. *New Haven Gas Co.*, [147 Conn. 672, 675, 165 A.2d 598] (1960)." (Citations omitted.)

[7] The parties had stipulated to the availability of Saxon, who was under subpoena by the plaintiff to testify.

determined that Saxon was not a witness who would naturally have been produced by the hospital. Because we conclude that the trial court was correct in finding that Saxon was not a witness who would naturally have been produced by the hospital, we affirm the court's decision not to deliver the requested instruction.[8]

This court first articulated the conditions under which such an instruction is appropriate in *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960). "The failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause. . . . There are two requirements for the operation of the rule: The witness must be available, and he must be a witness whom the party would naturally produce. . . . A witness who would naturally be produced by a party is one who is known to that party and who, by reason of his relationship to that party or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the party would produce." (Citations omitted; internal quotation marks omitted.) Id., 675; see *State* v. *Grant*, 221 Conn. 93,

---

[8] As the parties have pointed out in their briefs, Connecticut law is not entirely consistent on whether equal availability of a witness precludes a trial court from delivering a *Secondino* charge. *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960); compare, e.g., *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 191, 510 A.2d 972 (1986) ("it is irrelevant that . . . the witness was also available to other parties"), with *State* v. *Brown*, 169 Conn. 692, 705, 364 A.2d 186 (1975) ("[w]hen a witness is equally available to both parties no inference unfavorable to either may be drawn"); see also *Turner* v. *Scanlon*, 146 Conn. 149, 161, 148 A.2d 334 (1959) ("if it was within the power of both to bring the report into court, no inference unfavorable to either could be drawn").

Nevertheless, as long as the *Secondino* adverse inference instruction remains viable in Connecticut; see footnote 9, and the concurring opinion of Justice Palmer; we now hold that the mere fact that a witness is equally available to both parties does not preclude a trial court from delivering a *Secondino* charge.

105–106, 602 A.2d 581 (1992); *State* v. *Greene,* 209 Conn. 458, 469–70, 551 A.2d 1231 (1988); *Shelnitz* v. *Greenberg,* 200 Conn. 58, 73, 509 A.2d 1023 (1986); *State* v. *Brown,* 169 Conn. 692, 705, 364 A.2d 186 (1975); *Bell* v. *Bihary,* 168 Conn. 269, 271, 362 A.2d 963 (1975).[9]

A party, however, is not entitled to receive such an instruction in all circumstances. To have the jury charged on the rule, the party claiming the benefit of it must show that he is entitled to it. *Blake* v. *Blake,* 211 Conn. 485, 493, 560 A.2d 396 (1989); *Queen* v. *Gagliola,* 162 Conn. 164, 169, 292 A.2d 890 (1972). The party seeking the adverse inference instruction bears the burden of proving that the witness is both available and would naturally have been produced; *Shelnitz* v. *Greenberg,* supra, 200 Conn. 73; and the trial court must make a preliminary determination that there is evidence in the record to support these elements. See, e.g., *State* v. *Anderson,* 212 Conn. 31, 36, 561 A.2d 897 (1989); *State* v. *Shashaty,* 205 Conn. 39, 43, 529 A.2d 1308 (1987), cert. denied, 484 U.S. 1027, 108 S. Ct. 753, 98 L. Ed. 2d 766 (1988); *Maciejewska* v. *Lombard Bros., Inc.,* 171 Conn. 35, 43, 368 A.2d 206 (1976).

The trial court concluded that Saxon failed to meet the requirements of the second prong of *Secondino,* and

[9] At oral argument before this court, the defendant raised for the first time a claim that we should discard the *Secondino* adverse inference instruction and leave it to the parties, in closing arguments, to argue that the jury should draw a negative inference from a party's failure to call a "missing witness." We recognize that the rule in *Secondino* has come under attack from at least one commentator; see, e.g., C. Tait & J. LaPlante, Connecticut Evidence (Sup. 1994) § 11.5.4, p. 150 ("[t]he continuing validity of the 'missing witness' rule should be called into question"); see also *Tianti* v. *William Raveis Real Estate, Inc.,* 231 Conn. 690, 706 n.1, 651 A.2d 1286 (1995) *(Berdon, J.,* concurring and dissenting) (questioning validity of *Secondino* rule in view of our discard of voucher rule). Nevertheless, the parties in this case have not briefed this point. We leave the resolution of this issue, therefore, for another day.

therefore refused to give the requested instruction. According to the trial court, "[a] review of the deposition transcript shows that [Saxon] remembered virtually nothing of her brief encounter with Mrs. Hines in the emergency room and I just don't see that there was anything that she has to add which was peculiar or superior, especially in light of the admission of the emergency room record as an exhibit in the matter." We agree.

At trial, the plaintiff testified about what happened during her brief meeting with Saxon. She testified that she had told the register clerk that Jessica had not been eating well that day, and that Jessica had stopped breathing for about thirty seconds. The plaintiff explained to Saxon how Jessica looked and acted during the incident, and told her that Jessica's body had stiffened. The plaintiff testified that during the time that Saxon saw Jessica and her parents, Jessica was making grunting noises, but then stated that the baby "really wasn't doing anything. She was just laying there."

The medical record prepared by Saxon was admitted into evidence. This record revealed that the baby's problem, according to Saxon's interview with the plaintiff, was "swollen stomach, twice stop breathing." A transcript of Saxon's deposition testimony reveals that she could have added nothing to the medical record evidence already before the trial court. Saxon stated repeatedly during her deposition that she could not recall specifically what had happened at the hospital during the evening of March 11, 1987, some six and one-half years earlier.[10] She stated that a typical interview with a patient might take "a minute's time, it might even be shorter." She did remember that "a young lady with a baby" had come to the hospital that

---

[10] Saxon had been deposed on October 5, 1993.

night, but that she could not see the baby's face. Saxon remembered that the plaintiff "answered questions, she sat there, answered them brief—I ask brief little questions. She answered them brief, signed the chart, and [I] told her to take a seat in the waiting room and the nurse will be with you as soon as possible." Finally, Saxon remembered that the plaintiff had said "that the baby was sick, stomach was swollen, not eating and stopped breathing, and she specified, she said twice." Saxon could not remember, however, if she listened to the baby's breathing, and she could not remember anything else about the baby's behavior.

Saxon's deposition makes clear that she could not " 'reasonably be expected to have peculiar or superior information material to the case . . . .' " *State* v. *Grant*, supra, 221 Conn. 105–106; *State* v. *Greene*, supra, 209 Conn. 470; *Secondino* v. *New Haven Gas Co.*, supra, 147 Conn. 675. Indeed, her deposition makes clear that she could hardly remember what had happened that tragic evening some six and one-half years earlier. Furthermore, the only material bits of information Saxon could recall were reflected in Jessica's medical record, which was admitted into evidence. Under these circumstances, Saxon would not be a witness whom the hospital would naturally have called to testify. The trial court, therefore, was correct in refusing to instruct the jury that it could infer from the hospital's failure to call her as a witness that she would have offered damaging testimony.

The judgment is affirmed.

In this opinion the other justices concurred.

BORDEN, J., concurring. I join the majority opinion. I write separately, however, to explicate more fully why "we now hold that the mere fact that a witness is equally available to both parties does not preclude a trial

court from delivering a *Secondino* charge." Although ordinarily it is jurisprudentially wiser not to address issues that are not necessary to the decision in a particular case, in my view that wisdom does not apply in this case, because, as this record indicates, there is apparently some question among the trial bench about the proper rule, the parties fully briefed and argued the issue, and the answer to the question seems to me to be clear beyond any doubt. I therefore see no benefit in postponing the issue, and see considerable benefit in clarifying it.

As the majority points out, the two requirements for a *Secondino* adverse inference instruction against a party are that the witness: (1) is available; and (2) could reasonably be expected, by his relationship to the party or the issues, to have peculiar or superior information material to the case that, if favorable, the party would produce. *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 675, 165 A.2d 598 (1960). Put another, perhaps more accurate, way, "[t]he failure of a party to produce as a witness one who [1] is available and [2] . . . naturally would be produced permits the inference that such witness, if called, would have exposed facts unfavorable to the party's cause." *State* v. *Brown*, 169 Conn. 692, 704, 364 A.2d 186 (1975).

I agree with the majority that our cases have not been fully consistent on whether equal availability of the witness to both parties precludes a *Secondino* instruction. See footnote 8 of the majority opinion. It is clear to me, however, both from the weight of our precedent and from the rationale of *Secondino* itself, that the proper rule is that "it is irrelevant that . . . the witness was also available to other parties." *Russell* v. *Dean Witter Reynolds, Inc.*, 200 Conn. 172, 191, 510 A.2d 972 (1986).

Starting with *Secondino* itself, the first, or "availability," prong of the rule applied despite the fact that the witness was available by subpoena to both parties. "It would not be enough for [the plaintiff] to say that [the witness] was available by subpoena to both parties. He was a witness whom the plaintiff naturally would produce." *Secondino* v. *New Haven Gas Co.*, supra, 147 Conn. 676; see also *Russell* v. *Dean Witter Reynolds, Inc.*, supra, 200 Conn. 191; *Kelsey* v. *Connecticut State Employees Assn.*, 179 Conn. 606, 616, 427 A.2d 420 (1980) (witness was in courtroom, and therefore available to both parties); *Zack* v. *Guzauskas*, 171 Conn. 98, 102, 368 A.2d 193 (1976) (same).

The confusion in our case law has been sown primarily by dictum in *State* v. *Brown*, supra, 169 Conn. 705 ("when a witness is equally available to both parties no inference unfavorable to either may be drawn"), which cited *Turner* v. *Scanlon*, 146 Conn. 149, 161, 148 A.2d 334 (1959), for that proposition. In *Turner* v. *Scanlon*, supra, 149, the question involved a medical report of a doctor who had testified for the plaintiff without reference to the report. When the defendant requested the report for purposes of continuing his cross-examination, "the plaintiff agreed to bring to court the following morning such written reports concerning the plaintiff as were available in [the doctor's] office and to permit the defendant to introduce them in evidence without objection." Id., 160. The next morning, no mention was made of the reports. Id. Nonetheless, in final arguments each party sought to persuade the jury to draw adverse inferences from the failure of the other to produce the reports, prompting the trial court to address the issue in its instructions. Id., 161.

This court stated that "[w]e have no way of knowing upon this record whether the report was made available as agreed and, if it was, whether it contained the information which the defendant suspected it did. As

the matter stood before the jury, the defendant had requested the report, the doctor had offered to produce a copy of it if he had such a copy, and the court left it to the defendant to call the doctor as his witness." Id., 160–61. Addressing the claim of instructional error, we then stated, in a somewhat confusing and self-contradictory passage: "The [trial] court then referred to the claims of the parties and charged the jury that if it was within the power of both to bring the report into court, no inference unfavorable to either could be drawn, but that if the jury found that the report was so related to the whole proof in the case that one of the parties and not the other would be expected to produce it, an inference would be justified that the report, if produced, would be unfavorable to that party. Under the circumstances of this case this charge was appropriate and correct." Id., 161.

If the language of *Turner* is dictum, I would specifically disavow it and its progeny dictum in *State* v. *Brown*, supra, 169 Conn. 705. If the *Turner* language is a holding, I would specifically overrule it as wrongly decided because it is inconsistent with the very prong of *Secondino* that it purports to explain.

The first prong of *Secondino* is that the missing witness be available. The rationale for this requirement is that it would be fundamentally unfair to penalize, by an adverse inference, a party for failing to produce a witness whom the party was unable to produce. If, however, a witness is available—in the sense that he or she could be subpoenaed—to one party, by definition the same witness is also available to the other party. Consequently, to say that *Secondino* does not apply when the witness is available to both parties is to say that *Secondino* never applies.

Therefore, I join the majority in squarely and explicitly disavowing the lingering proposition that

equal availability of the witness to the subpoena power of both parties precludes a *Secondino* adverse inference instruction. With these comments, I concur in the majority opinion.

PALMER, J., concurring. I fully agree with the majority opinion and with the concurring opinion of Justice Borden. I write separately only to express my doubts about the continuing vitality of the "missing witness" rule, first announced by this court in *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960). As Professor Tait has stated, "[n]ot only does [the rule] consume an undue proportion of the attention of [Connecticut's] appellate courts, its underlying premise has been substantially undermined. The rule originated at a time when parties 'vouched' for the veracity of their witnesses so that an opponent dared not call an adverse witness. Since a partial witness would be called only by the favored party, that party's failure to call the witness, if available, warranted a negative inference. The voucher rule no longer applies in Connecticut. Under Connecticut's modern rules a party may call an adverse witness, including the opposing party. If an adverse witness is called, the party calling that witness may use leading questions to interrogate the witness and, if necessary, to impeach the witness. In addition, Connecticut permits widespread discovery so that all parties know, and may depose, all relevant witnesses before trial. Thus, each party should in fact know which witnesses are favorable to which side. That being so, why should a party not be required to call any witness favorable to his cause? If a witness is available, he is equally available to both sides. If a witness has information favorable to one side, why shouldn't that side call that witness and bring out that information instead of relying on a negative inference based on ignorance that such a

witness might have some unspecified information that might be unfavorable to the other party? See *Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1046–1048 (5th Cir. 1990). Moreover, the *Secondino* rule is costly. It consumes the time of both the court and the parties, and it incurs expense even for parties who do not wish to call a witness, since they must nevertheless pay to have witnesses available to preclude the assertion of an adverse inference." C. Tait & J. LaPlante, Connecticut Evidence (Sup. 1994) § 11.5.4, pp. 150–51.

Although there may be some reason to retain the "missing witness" rule, the issues raised by Professor Tait indicate that the rule may very well have outlived its usefulness. While I agree that we need not, and should not, decide in this case whether *Secondino* should be overruled, that question warrants the careful consideration of this court in the appropriate case.