# STATE OF CONNECTICUT *v.* ALEX MALAVE
## (SC 15898)

Callahan, C. J., and Borden, Berdon, Palmer, McDonald,
Peters and Ment, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued January 12—officially released September 21, 1999

*Brien P. Horan*, with whom, on the brief, were *Eric W.G. Dawson* and *Lisa Gizzi*, for the appellant (defendant).

*Rita M. Shair*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, *Paul J. Ferencek*, senior assistant state's attorney, and *John Waddock*, assistant state's attorney, for the appellee (state).

*G. Douglas Nash*, chief of legal services, *Susan M. Hankins*, assistant public defender, and *Gerard A. Smyth*, chief public defender, filed a brief for the office of the chief public defender as amicus curiae.

*Ben A. Solnit, Angela P. Sands, Ann M. Parrent* and *Jon L. Schoenhorn* filed a brief for the Connecticut Civil Liberties Union Foundation et al. as amici curiae.

*Opinion*

PALMER, J. After a jury trial, the defendant, Alex Malave, was convicted of two counts of assault in the first degree in violation of General Statutes § 53a-59 (a)

(1).[1] The trial court rendered judgment in accordance with the jury's guilty verdict, and the defendant appealed to the Appellate Court, which affirmed his convictions. *State* v. *Malave*, 47 Conn. App. 597, 707 A.2d 307 (1998). We granted the defendant's petition for certification limited to the following issue: "As a matter of policy, should the [missing] witness rule of *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960),[2] be abandoned?" *State* v. *Malave*, 244 Conn. 913, 713 A.2d 832 (1998). We agree with the defendant that, for reasons of policy, the *Secondino* rule should be abandoned.[3] We also conclude, however, that the missing witness instruction given by the trial court in this case was harmless. We, therefore, affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts that the jury reasonably could have

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[2] In *Secondino* v. *New Haven Gas Co.*, supra, 147 Conn. 672, this court stated that "[t]he failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause." (Internal quotation marks omitted.) Id., 675. This principle, previously articulated by this court in *Ezzo* v. *Geremiah*, 107 Conn. 670, 677, 142 A. 461 (1928), and subsequently approved for use in criminal cases; see *State* v. *Daniels*, 180 Conn. 101, 109, 429 A.2d 813 (1980); *State* v. *Annunziato*, 169 Conn. 517, 536–39, 363 A.2d 1011 (1975); commonly is referred to as the *Secondino* rule or the missing witness rule. Similarly, the jury charge explaining the rule commonly is referred to as the *Secondino* instruction or the missing witness instruction. We use these terms interchangeably throughout this opinion.

[3] As we discuss later in this opinion, our legislature recently has barred the use of the *Secondino* instruction in all *civil* actions. Public Acts 1998, No. 98-50 (P.A. 98-50), codified at General Statutes § 52-216c; see footnote 7 of this opinion. Thus, in this appeal, we are asked to reconsider the propriety of such an instruction in *criminal* cases—an issue that P.A. 98-50 does not address.

found. "On June 12, 1994, Jose Garcia drove his brother, Oswaldo Garcia, to the Latin American Club located on South Colony Street in Meriden. After Jose left, Oswaldo was approached by a man who claimed that Oswaldo had wrongfully intervened in an altercation at the club the night before. After Oswaldo telephoned Jose and asked him to return to the club, a group gathered around Oswaldo. Someone in the group asked Oswaldo if he wanted to 'go one on one' with the man who had originally approached him. The defendant threw a beer bottle at Oswaldo, and a fight erupted between Oswaldo and the defendant, who was supported by the other men. During the altercation, a hunting knife that Oswaldo carried fell to the ground. The defendant retrieved the knife and stabbed Oswaldo several times. Jose arrived during the fight and Oswaldo managed to get into Jose's car. Before Jose was able to drive away, the defendant stabbed Jose in the shoulder. During the drive to the hospital, Oswaldo removed the knife from Jose's shoulder and threw it out the window.

"While at the hospital, Oswaldo told police officers that the defendant, whom he had known for several years, was the assailant. Thereafter, Jose and Oswaldo independently identified a photograph of the defendant as being of the assailant. The defendant's picture was selected from an array of photographs that was presented separately to the brothers by police detectives." *State* v. *Malave,* supra, 47 Conn. App. 599.

At trial, "[t]he defendant testified that he did not commit the assaults and that he was inside the club playing pool when the fight erupted. He presented testimony in support of his alibi defense from several witnesses, including Maria Castro. The evidence showed that Cindy Castro was in the club with Maria Castro and the defendant.[4] The state requested a *Secondino*

---

[4] The testimony at trial indicated that Cindy Castro and Maria Castro are not related.

charge because of the defendant's failure to call Cindy Castro." Id., 607. The trial court overruled the defendant's objection to the state's request, and instructed the jury in relevant part as follows: "In [his] final argument, [the assistant state's attorney] asked you to infer from the fact that the defendant did not bring Cindy Castro into court to testify, that if she did testify her testimony would have been unfavorable to the defendant. Under our law, if a party to a case has failed to call to the stand a witness who is within his power to produce, and who would naturally have been produced by him, you may infer that the testimony of the witness would have been unfavorable to the party failing to call her, and consider that fact in arriving at your decision. You may draw such an inference, but you are not required to draw such an inference. You may draw such an inference only if you determine it is a reasonable and logical inference to be drawn.

"In order to make this inference in this case, you must first find that it is more probable than not that Cindy Castro was available, and second, that she is a witness whom the defendant would naturally produce. Whether the witness is available is a question of fact for you to determine, before you draw an adverse inference from [Cindy Castro's] absence.

"Availability may be determined not only from mere physical presence or accessibility, but also from the usefulness or nature of the expected testimony. Also relevant is whether the witness is in such a relationship with the defendant that it is likely that her presence could be procured. A witness who would naturally be produced by a party is one who is known to that party, and who by reason of her relationship to that party or the issues in the case or both, could reasonably be expected to have peculiar or superior information relevant to the case which, if favorable, the party would have produced. As with the question of availability, it

is for you to determine from the evidence presented whether the absent witness' testimony would be relevant to the case, before you draw any adverse inference.

"A party's failure to call as a witness a person who is available, but does not stand in such a relationship to the party or to the issues so that the party would naturally be expected to produce her if her testimony were favorable, is not a basis for an unfavorable inference."

At the conclusion of the trial, the jury rejected the defendant's alibi defense, and convicted him, as charged, of two counts of assault in the first degree.

On appeal to the Appellate Court, the defendant claimed, inter alia, that the *Secondino* rule should be abandoned.[5] The Appellate Court refused to consider the merits of the defendant's claim, stating that "it is axiomatic that this court cannot review or reverse Supreme Court precedent."[6] Id.

On appeal to this court, the defendant posits several reasons in support of his claim that we should abandon the *Secondino* rule. First, the defendant asserts that the rule has been rendered obsolete because of the advent of modern discovery procedures and our abandonment

---

[5] The defendant also claimed in the Appellate Court that the trial court improperly: (1) restricted his voir dire examination of prospective jurors; (2) highlighted the criminal records of the defendant and a key defense witness during its instructions to the jury; and (3) failed to instruct the jury that lack of motive should be considered in assessing reasonable doubt. *State* v. *Malave*, supra, 47 Conn. App. 598–99. The Appellate Court rejected these claims. These claims are not the subject of this certified appeal.

[6] The Appellate Court further noted that, "[w]hile the defendant is aware that we cannot review this claim, he makes it nonetheless to preserve the record in the event of Supreme Court review." *State* v. *Malave*, supra, 47 Conn. App. 608. The defendant also raised two additional claims in the Appellate Court, challenging the propriety of the trial court's *Secondino* instruction in the circumstances of this case. The Appellate Court declined to review one of those claims and rejected the other. Id., 609. We have not certified those two issues and, consequently, they are not before us.

of the so-called "voucher rule," a common-law rule that, prior to its demise, precluded a party from impeaching his or her own witness. Second, the defendant contends that, because there are many reasons why a party may choose not to call a particular witness, the missing witness rule unfairly highlights only one of those possible reasons, namely, that the witness' testimony would be adverse to that party. Third, the defendant asserts that the *Secondino* rule places an inordinate burden on the judicial system because it results in longer trials with additional witnesses and gives rise to complicated trial and appellate issues. Finally, the defendant argues that the use of a *Secondino* instruction in a criminal case is constitutionally suspect because it creates a grave risk of juror misunderstanding regarding the fundamental principle that an accused bears no burden of proving his or her innocence.

The state disputes each of the defendant's arguments, claiming that we should retain the missing witness rule in criminal cases because the principle upon which it is founded is a sound one, as evidenced by its continued use in a majority of federal and state courts. In essence, the state maintains that the rule continues to play an important role in the truth seeking function of the trial process, and may be applied without jeopardizing a criminal defendant's right to a fair trial.

We agree with the defendant that, in light of all of the relevant considerations, the continued use of the *Secondino* instruction is unwarranted. Nevertheless, the defendant is not entitled to a new trial because he cannot establish that he was harmed as a result of the *Secondino* instruction in this case.

I

For decades, this court, along with a majority of other state and federal courts, has sanctioned a jury instruction that "[t]he failure of a party to produce as a witness

one who [1] is available and [2] . . . naturally would be produced permits the inference that such witness, if called, would have exposed facts unfavorable to the party's cause." *State* v. *Brown*, 169 Conn. 692, 704, 364 A.2d 186 (1975); see also *Graves* v. *United States*, 150 U.S. 118, 121, 14 S. Ct. 40, 37 L. Ed. 1021 (1893) ("[t]he rule even in criminal cases is that if a party has it peculiarly within its power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable"); R. Stier, "Revisiting the Missing Witness Inference—Quieting the Loud Voice from the Empty Chair," 44 Md. L. Rev. 137, 149 n.53 (1985) (citing cases). We adopted the missing witness rule for civil cases more than seventy years ago; *Ezzo* v. *Geremiah*, 107 Conn. 670, 677, 142 A. 461 (1928); and expressly approved the rule for use in criminal cases nearly twenty-five years ago. *State* v. *Annunziato*, 169 Conn. 517, 538–39, 363 A.2d 1011 (1975). In 1998, however, the legislature prohibited the use of the missing witness instruction in civil cases; Public Acts 1998, No. 98-50;[7] and this court, acknowledging that the vitality of the *Secondino* rule has been questioned; see *State* v. *Taylor*, 239 Conn. 481, 493 n.9, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997); *Hines* v. *St. Vincent's Medical Center*, 232 Conn. 632, 638 n.9, 657 A.2d 578 (1995); recently signaled its willingness to reconsider the merits of the rule as a matter of policy in criminal cases. See *State* v. *Taylor*, supra, 493 n.9; *Hines* v.

---

[7] Public Acts 1998, No. 98-50, which is codified at General Statutes § 52-216c, provides: "No court in the trial of a civil action may instruct the jury that an inference unfavorable to any party's cause may be drawn from the failure of any party to call a witness at such trial. However, counsel for any party to the action shall be entitled to argue to the trier of fact during closing arguments, except where prohibited by section 52-174 of the general statutes, that the jury should draw an adverse inference from another party's failure to call a witness who has been proven to be available to testify."

*St. Vincent's Medical Center*, supra, 638 n.9. For the reasons that follow, we conclude that the rule should be abandoned in criminal cases.[8]

First, the need for the missing witness rule has been obviated, to a significant degree, by the advent of modern discovery procedures, which have made it easier for both the state and the defendant to ascertain the substance of the testimony of prospective witnesses. For example, each party is entitled to disclosure of the names and addresses of witnesses that the opposing party intends to call in its case-in-chief, along with the

---

[8] Although the majority of state and federal courts continue to employ the missing witness rule, some jurisdictions have rejected it. See, e.g., *Herbert* v. *Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1048 (5th Cir. 1990) (rejecting missing witness rule for both civil and criminal cases); *State* v. *Brewer*, 505 A.2d 774, 777 (Me. 1985) (rejecting missing witness rule for criminal cases); *State* v. *Parker*, 417 N.W.2d 643, 647 (Minn. 1988) (same); *Henderson* v. *State*, 367 So. 2d 1366, 1368 (Miss. 1979) (same); *Ross* v. *State*, 106 Nev. 924, 927, 803 P.2d 1104 (1990) (same); *State* v. *Jefferson*, 116 R.I. 124, 139–40, 353 A.2d 190 (1976) (same); *State* v. *Hammond*, 270 S.C. 347, 356, 242 S.E.2d 411 (1978) (rejecting missing witness rule for both criminal and civil cases); *Russell* v. *Commonwealth*, 216 Va. 833, 836–37, 223 S.E.2d 877 (1976) (rejecting missing witness rule for criminal cases). In addition to the courts that have abandoned the missing witness rule, other courts have expressed wariness over the rule. See, e.g., *International Union* v. *National Labor Relations Board*, 459 F.2d 1329, 1335 (D.C. Cir. 1972) (approving inference but acknowledging that "the unwary [might] conclude that the adverse inference rule is one of those intricate gems of the common law which is riddled with nonsensical exceptions, encrusted with gloss upon gloss, and surrounded by an arcane lore last fully explicated in a three-volume treatise published in the late 19th century"); *Carr* v. *United States*, 531 A.2d 1010, 1012 (D.C. 1987) ("[a]lthough the missing witness inference has ancient roots . . . we have been chary of its use in criminal prosecutions, primarily because of concern that the inference creates evidence from nonevidence" [citation omitted]); *Taylor* v. *State*, 676 N.E.2d 1044, 1046 (Ind. 1997) ("[t]he tendered instruction, commonly referred to as a missing witness instruction, is not generally favored in Indiana"); *Crosser* v. *Dept. of Public Safety*, 240 N.W.2d 682, 685 (Iowa 1976) ("The inference should be invoked prudently. Despite the plenitude of cases supporting the inference, caution in allowing it is suggested with increasing frequency." [Internal quotation marks omitted.]); *Commonwealth* v. *Groce*, 25 Mass. App. 327, 330, 517 N.E.2d 1297 (1988) (missing witness inference "should be invited only in clear cases, and with caution").

statements[9] of those witnesses that relate to the subject matter of their testimony. Practice Book § 40-13.[10] Furthermore, upon request of the state, the defendant is obligated to notify the state in writing of his or her intention to rely upon an alibi defense, and also must provide the state with the names and addresses of the witnesses who will testify in support of the alibi defense. Practice Book § 40-21. Similarly, a defendant who provides notice of an alibi defense to the state is entitled to written disclosure from the state of the names and addresses of the witnesses upon whom the state intends to rely to rebut the defendant's alibi defense. Practice Book § 40-22. Moreover, a defendant who intends to raise the affirmative defense of mental disease or defect or of extreme emotional disturbance at the time of the alleged offense is required to give written notification to the state of his or her intention to do so; Practice Book § 40-17; and, in addition, must provide the state with copies of reports based on physical or mental examinations of the defendant, prepared by any expert whom the defendant intends to call as a witness in support of such affirmative defense. Practice Book § 40-18. Finally, in felony cases, the court may permit a party to depose a witness in advance of trial if that party can establish that he or she will be unable to secure the trial testimony of that witness. Practice Book § 40-44.

Although we acknowledge that our civil discovery rules are broader than those applicable in criminal

---

[9] A "statement" is defined as: "(1) A written statement made by a person and signed or otherwise adopted or approved by such person; or

"(2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement." Practice Book § 40-15.

[10] We note that the defendant is exempt from disclosing any statements in his or her possession that were made by the defendant himself or herself; Practice Book § 40-13 (b); and the state also is exempt from providing the defendant with certain types of statements. See, e.g., Practice Book § 40-14 (2).

cases, our law nevertheless "provides liberal discovery procedures for criminal defendants, both as a matter of right . . . and as matters for the discretion of the court . . . ." (Citations omitted.) *State* v. *Villafane*, 171 Conn. 644, 668, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977), overruled in part on other grounds, *State* v. *Stepney*, 191 Conn. 233, 254, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). "[T]he availability of [such] discovery procedures sharply undercuts whatever utility the [missing witness rule] might once have [had] in compelling a reluctant party to identify witnesses who might be expected to testify to relevant evidence." *State* v. *Brewer*, 505 A.2d 774, 777 (Me. 1985); see also 2 C. McCormick, Evidence (4th Ed. 1992) § 264, pp. 186–87 ("the availability of modern discovery and other disclosure procedures serves to diminish both the justification and the need for the inference").

Moreover, the voucher rule, which prohibited a party from impeaching or discrediting his or her own witness except in certain limited circumstances, has been abandoned in this state.[11] *State* v. *Graham*, 200 Conn. 9,

---

[11] As we stated in abandoning the voucher rule: "Historically, the rationale behind the rule was first, that the party by calling the witness to testify vouches for the trustworthiness of the witness, and second, that the power to impeach is the power to coerce the witness to testify as desired, under the implied threat of blasting the character of the witness if the witness does not. . . . These reasons have become discredited and are generally thought no longer to justify the restrictions imposed on the parties. . . . For example, the United States Supreme Court has declared: Whatever validity the voucher rule may have once enjoyed . . . it bears little present relationship to the realities of the criminal process. It might have been logical for the early common law to require a party to vouch for the credibility of witnesses he brought before the jury to affirm his veracity. Having selected them especially for that purpose, the party might reasonably be expected to stand firmly behind their testimony. But in modern criminal trials, [parties] are rarely able to select their witnesses: they must take them where they find them. *Chambers* v. *Mississippi*, 410 U.S. 284, 296, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)." (Citations omitted; internal quotation marks omitted.) *State* v. *Graham*, 200 Conn. 9, 16, 509 A.2d 493 (1986).

17, 509 A.2d 493 (1986). "The [missing witness] rule originated at a time when parties 'vouched' for the veracity of their witnesses so that an opponent dared not call an adverse witness. Since a partial witness would be called only by the favored party, that party's failure to call the witness, if available, warranted a negative inference. . . . Under Connecticut's modern rules a party may call an adverse witness . . . . If an adverse witness is called, the party calling that witness may use leading questions to interrogate the witness and, if necessary, to impeach the witness." C. Tait & J. LaPlante, Connecticut Evidence (Sup. 1998) § 11.5.4, p. 212. In view of this fact, and because, under our criminal discovery rules, each party generally will be able to ascertain which witnesses are favorable to which side, "[i]f a witness is available, he is equally available to both sides.[12] If a witness has information favorable to one side, why shouldn't that side call that witness and bring out that information instead of relying on a negative inference based on ignorance that such a witness might have some unspecified information that might be unfavorable to the other party?" Id.; see also *State* v. *Brewer*, supra, 505 A.2d 776–77 ("[A]ny logical basis for the missing-witness inference [has been removed] by abolishing the practice of vouching. . . . Since neither party vouches for any witness's credibility, the failure of a party to call a witness cannot be treated as an evidentiary fact that permits any inference as to the content of the testimony of that witness." [Citations omitted; internal quotation marks omitted.]) In light of our modern rules of discovery and procedure, therefore, the "underlying premise [of the missing witness rule] has been substantially undermined." C. Tait & J. LaPlante, supra, § 11.5.4, p. 212.

---

[12] Moreover, a witness who is "available" in the sense that he or she could be subpoenaed, is equally available to both parties. See *Hines* v. *St. Vincent's Medical Center*, supra, 232 Conn. 643 (*Borden, J.*, concurring).

Second, the missing witness rule is predicated upon the questionable assumption that a party's failure to call a particular witness is due to the fact that the witness' testimony would be adverse to that party. Contrary to that assumption, there are many reasons why a party may choose to refrain from calling a witness that have little or nothing to do with the substance of the witness' testimony. "Every experienced trial lawyer knows that the decision to call a witness often turns on factors which have little to do with the actual content of his testimony. Considerations of cumulation and jury fatigue may preclude calling a witness who is entirely helpful; calculations that a witness may help a lot but hurt a little may compel restraint when counsel believes that his burden is already met. Then, too, questions of demeanor and credibility, hostility, and the like may influence the [party] not to produce a witness whose testimony might be entirely harmful to the [opposing party]. And, of course . . . in many instances, a witness's testimony might have been neither helpful nor adverse to the party who failed to call him."[13] *United States* v. *Busic*, 587 F.2d 577, 586 (3d Cir. 1978), rev'd on other grounds, 446 U.S. 398, 100 S. Ct. 1747, 64 L. Ed. 2d 381 (1980); see also R. Stier, supra, 44 Md. L. Rev. 143–44 n.29 ("[t]here is a difference between evidence that is 'unfavorable' and evidence that is merely 'not favorable' "). Thus, "the probative relationship

---

[13] Furthermore, the jury often is unaware of the other reasons why a party may have decided not to call the missing witness. In such cases, there is an enhanced risk that the jury will draw an adverse inference in circumstances that do not, in fact, warrant it. See, e.g., *United States* v. *Sblendorio*, 830 F.2d 1382, 1394 (7th Cir. 1987), cert. denied, 484 U.S. 1068, 108 S. Ct. 1034, 98 L. Ed. 2d 998 (1988) ("Unless the jury knows exactly why a party did not call a witness, it cannot fully evaluate the meaning of the witness' absence. The reasons for not calling witnesses are so many and so complex—from a desire to avoid carrying coals to Newcastle to concern about the witness's appearance and demeanor to concern about the content of the testimony to a belief that the witness would invoke the privilege against self-incrimination—that a full exploration could take the trial far afield.").

between the failure to produce a witness and the actual content of that witness's testimony is weak." Note, "Speak of the Missing Witness, and Surely He Shall Appear: The Missing Witness Doctrine and the Constitutional Rights of Criminal Defendants," 67 Wash. L. Rev. 691, 698 (1992); see also R. Stier, supra, 142–43 (variety of inferences may be drawn from party's failure to produce witness, which, in and of itself, says nothing about actual content of missing witness' testimony). As a consequence, the adverse inference that may be drawn by the jury frequently is not valid, for "[c]onjecture or ambiguity of inference is often present." 2 C. McCormick, supra, § 264, p. 186; see also *Dent* v. *United States*, 404 A.2d 165, 171 (D.C. App. 1979) (noting danger that rule may add "fictitious weight" to one side of case by according missing witness "undeserved significance"). Finally, the risk that the jury will give undue weight to a witness' absence is further enhanced because, under the *Secondino* rule, the trial court expressly instructs the jury that it may draw an adverse inference from the party's failure to call the witness. "[T]here is a difference between what the jury might infer on its own, which can never be completely controlled, and what the jury might think when the absence of certain evidence is highlighted by . . . the judge's instructions." J. McDonald, "Drawing an Inference from the Failure to Produce a Knowledgeable Witness: Evidentiary and Constitutional Considerations," 61 Cal. L. Rev. 1422, 1430 (1973); see also *Carter* v. *Kentucky*, 450 U.S. 288, 302 n.20, 101 S. Ct. 1112, 67 L. Ed. 2d 241 (1981) ("influence of the trial judge on the jury is necessarily and properly of great weight, and . . . his lightest word or intimation is received with deference, and may prove controlling" [internal quotation marks omitted]).

Third, the missing witness rule consumes a significant amount of judicial time and resources in light of the questions that arise, both at trial and on appeal,

regarding the proper application of the rule. Although the rule itself may be stated succinctly, the issues that it generates frequently are complex. "The rule seems intended to respond to jurors' common sense notions, by allowing them to draw the 'natural conclusion' from a party's failure to explain or contradict harmful evidence. Yet, in their attempt to explain when the inference is natural, the courts have produced a set of guidelines that are extraordinary for their unnatural complexity, their ability to confuse, and their potential for abuse." R. Stier, supra, 44 Md. L. Rev. 146. "Numerous American courts . . . have struggled in a vast multitude of lawsuits to separate the types of situations wherein the witness' absence has real significance from those in which it does not. The distillation from these efforts is a fairly complex body of rules by resort to which the fitness of the occasion for jury consideration of an unfavorable inference is to be measured." *United States* v. *Young*, 463 F.2d 934, 946 (D.C. Cir. 1972) (Robinson, J., concurring).

Moreover, concern that the inference will be drawn undoubtedly prompts some parties to present witnesses that they otherwise would not call to testify, thereby increasing the length of trials. See, e.g., *Russell* v. *Commonwealth*, 216 Va. 833, 836, 223 S.E.2d 877 (1976) ("if [the missing witness inference] is permitted, both the prosecution and defense, against the risk of having the instruction granted at the request of the opposing party, would be required to call all witnesses possibly having some knowledge of the case"); 2 C. McCormick, supra, § 264, p. 186 ("[t]he possibility that the inference may be drawn invites waste of time in calling unnecessary witnesses or in presenting evidence to explain why they were not called"). "In addition to wasted court time, the [missing witness] rule generates wasteful expense to the parties and witnesses. If a party does not wish to call a so-called 'partial' witness, to preclude an adverse

inference the party must either call that witness or have that witness available to testify should his adversary seek a *'Secondino'* charge." C. Tait & J. LaPlante, supra, § 11.5.4, pp. 212–13. Indeed, this is the primary reason why the legislature has barred the use of the missing witness instruction in civil cases.[14] We are persuaded, therefore, that "[i]n very few cases would the evidentiary value of the inference, which could only strengthen or weaken other affirmative proof, justify the necessary expenditure of judicial time." J. McDonald, supra, 61 Cal. L. Rev. 1429.

Finally, application of the *Secondino* rule in criminal cases gives rise to constitutional issues not present in civil cases. Indeed, some courts have concluded that a missing witness instruction unconstitutionally diminishes the state's burden of proving the defendant's guilt beyond a reasonable doubt by suggesting to the jury that the defendant has some obligation to produce evidence. See, e.g., *State* v. *Brewer*, supra, 505 A.2d 777 ("To allow the missing-witness inference in a criminal case is particularly inappropriate since it distorts the allocation of the burden of proving the defendant's guilt. The defendant is not obligated to present evidence on his own behalf. The inference may have the effect of requiring the defendant to produce evidence to rebut the

---

[14] The statement of purpose of the legislation abolishing the missing witness rule in civil cases was "[t]o overrule the decision of the Connecticut Supreme Court in *Secondino* v. *New Haven Gas Co.*, [supra, 147 Conn. 672] and its progeny *which results in longer trials with additional witnesses.*" (Emphasis added.) House Bill No. 5584, 1998 Sess. (statement of purpose). Moreover, as Robert Adelman, the president of the Connecticut Trial Lawyers Association, the primary proponent of the legislation, stated in his testimony before the judiciary committee: "This Bill, if passed, would shorten civil trials by reducing the number of witnesses called." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 6, 1998 Sess., p. 1716. "[The *Secondino* rule] has put trial lawyers in the position where we must call witnesses we do not need, just to avoid the adverse inference. This lengthens trials. In addition, it has created a huge amount of appellate litigation about the proper application of the rule." Id., p. 1720, remarks of Adelman.

inference. If he fails to do so, the missing-witness inference allows the state to create 'evidence' from the defendant's failure to produce evidence. Such a result is impermissible."); *Russell* v. *Commonwealth*, supra, 216 Va. 837 ("[Missing witness instructions] . . . run head on into the presumption of innocence to which every accused is entitled and upon which juries are universally instructed. . . . To tell a jury that the failure of the defense to call a material witness raises an adverse presumption against the accused is to weaken, if not neutralize, the presumption of innocence which, if given its full strength, might be sufficient to tip the scales in favor of acquittal."). We repeatedly have rejected such arguments; see, e.g., *State* v. *Taylor*, supra, 239 Conn. 490; *State* v. *Anderson*, 212 Conn. 31, 41–42, 561 A.2d 897 (1989); *State* v. *Shashaty*, 205 Conn. 39, 43–44, 529 A.2d 1308, cert. denied, 484 U.S. 1027, 108 S. Ct. 753, 98 L. Ed. 2d 766 (1988); *State* v. *Annunziato*, supra, 169 Conn. 538; and we see no persuasive reason to reconsider our holding that "[t]he giving of a *Secondino* charge is purely an evidentiary issue and is not a matter of constitutional dimensions." *State* v. *Anderson*, supra, 41–42; accord *State* v. *Taylor*, supra, 490. We acknowledge, nevertheless, that these arguments lend some support to the defendant's claim that, as a policy matter, the *Secondino* rule should be abandoned in criminal cases.

For all the aforementioned reasons, we conclude that the time has come to abandon the missing witness rule. We recognize that the rule has firm roots in our common law, and "we are not unmindful of the important role that the doctrine of stare decisis plays in our system of justice. Stare decisis, however, is not an end in itself. . . . Thus, [p]rinciples of law which serve one generation well may, by reason of changing conditions, disserve a later one. . . . Experience can and often does demonstrate that a rule, once believed sound, needs

modification to serve justice better. . . . The flexibility and capacity of the common law is its genius for growth and adaptation." (Citations omitted; internal quotation marks omitted.) *State* v. *Troupe*, 237 Conn. 284, 303–304, 677 A.2d 917 (1996). As we observed when we adopted the missing witness rule many years ago, a missing witness instruction "not infrequently . . . may tip the scales against the party"; *Ezzo* v. *Geremiah*, supra, 107 Conn. 677; who failed to produce the witness in question. We conclude that such a result cannot be justified now because the missing witness "charge is no longer warranted in most situations, and in those few instances in which it might apply, a mandated judicial instruction over-emphasizes its usefulness to the jury. In the end it becomes an adversarial game refereed by judges, a game which generates much heat, sheds little light, and consumes scarce judicial resources." C. Tait & J. LaPlante, supra, § 11.5.4, p. 213.

Although we abandon the *Secondino* rule today, we do not prohibit counsel from making appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case.[15] For example, in this case, it would have been permissible for the prosecutor to draw the jury's attention to Cindy Castro's absence from the trial and to assert that the defendant did not present sufficient credible evidence to support his alibi defense. So long as counsel does not directly exhort the jury to draw an adverse inference by virtue of the witness' absence, the argument does not fall within the *Secondino* rule, and our holding today does not forbid it.[16] See, e.g., *State* v.

[15] Of course, the state may not comment, either directly or indirectly, on the failure of the defendant to testify. E.g., *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965).

[16] It may be true, of course, that the implicit point of such argument would be to attempt to persuade the jury to infer that the witness, if produced, likely would have provided testimony adverse to the opposing party. We also acknowledge that, under Public Acts 1998, No. 98-50, counsel in civil

*Clark,* 48 Conn. App. 812, 831, 713 A.2d 834, cert. denied, 245 Conn. 921, 717 A.2d 238 (1998) (comment on missing witnesses proper when prosecutor did not ask jury to draw adverse inference from witnesses' absence); *State* v. *Ross,* 18 Conn. App. 423, 432, 558 A.2d 1015 (1989) (prosecutor's comment on absence of witnesses constituted fair argument on weakness of defendant's case). Fairness, however, dictates that a party who intends to comment on the opposing party's failure to call a certain witness must so notify the court and the opposing party in advance of closing arguments. Advance notice of such comment is necessary because comment on the opposing party's failure to call a particular witness would be improper if that witness were unavailable due to death, disappearance or otherwise. That notice will ensure that an opposing party is afforded a fair opportunity to challenge the propriety of the missing witness comment in light of the particular circumstances and factual record of the case. Of course, the trial court retains wide latitude to permit or preclude such a comment, and may, in its discretion, allow a party to adduce additional evidence relative to the missing witness issue.

II

The defendant claims that he is entitled to a new trial in view of our abandonment of the *Secondino* rule. Specifically, he claims that the *Secondino* instruction given by the trial court regarding the defendant's failure to produce Cindy Castro, a potential alibi witness, constituted harmful error. We disagree.

Because the giving of a *Secondino* instruction does not implicate a defendant's constitutional rights; see,

cases are entitled to argue that "the jury *should draw an adverse inference* from another party's failure to call a witness who has been proven to be available to testify." (Emphasis added.) We nevertheless believe that, for criminal cases, it is the sounder policy for counsel, whether the prosecutor or defense counsel, to avoid explicit reference to such an inference.

e.g., *State* v. *Taylor*, supra, 239 Conn. 490; "the defendant has the appellate burden to establish harm flowing from the [instructional] error, in order to secure a reversal of the judgment. We recognize that we have not been fully consistent in our articulation of the standard for establishing harm. One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. . . . *State* v. *McIntyre*, 242 Conn. 318, 329, 699 A.2d 911 (1997); *State* v. *Wilkes*, 236 Conn. 176, 188, 671 A.2d 1296 (1996); *State* v. *Cavell*, 235 Conn. 711, 721–22, 670 A.2d 261 (1996). Another line of cases states that the defendant must establish that the trial court error caused him substantial prejudice. *State* v. *Askew*, 245 Conn. 351, 371, 716 A.2d 36 (1998). We need not resolve this difference in formulation in the present case, nor need we determine whether there is any functional difference between the two formulations, because we conclude that the defendant has failed to sustain his burden under either standard." (Internal quotation marks omitted.) *State* v. *Shabazz*, 246 Conn. 746, 759, 719 A.2d 440 (1998), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999).

First, the evidence presented by the state against the defendant was strong. At the hospital emergency room, Oswaldo Garcia, who knew the defendant, had told the nurses, and later the police, that the defendant had stabbed him. Thereafter, both Oswaldo and the second victim, his brother Jose Garcia, independently identified the defendant as the assailant, selecting his photograph from a photographic array. At trial, both Oswaldo and Jose positively identified the defendant as the perpetrator.

Furthermore, the jury heard detailed testimony regarding the defendant's alibi defense. Specifically, the defendant himself testified that he was inside the Latin American Club when an argument started in the parking

lot, and that he had left the club shortly after he had observed Oswaldo enter the club, grab a pool cue, and run back outside. The defendant claimed that he did not speak with, threaten or stab either Oswaldo or Jose. Three other witnesses, Domingo Garcia, Isabell Vargas, and Maria Castro, the defendant's girlfriend at the time of the incident, all testified on behalf of the defendant and, to varying degrees, substantiated his alibi defense.[17] Although the evidence indicated that Cindy Castro also was in the club with the defendant and that she left with him and Maria Castro, her testimony was largely cumulative of that of the three other witnesses.

Finally, the instruction the trial court gave in accordance with *Secondino* did not require the jury to draw an adverse inference as a result of the defendant's failure to produce Cindy Castro; rather, the court apprised the jury that it *could* draw such an inference *if* it found that each of the *Secondino* requirements had been met. Moreover, because the defendant elicited such extensive testimony in support of his alibi defense, there is a reasonable basis to presume that the jury attributed the defendant's failure to produce Cindy Castro not to any concerns about the substance of her testimony, but, rather, to her unavailability[18] or to the fact that her testimony would have been cumulative or otherwise unnecessary. Indeed, in his closing argument, defense counsel explained to the jury that Cindy Castro was not a necessary witness because she had nothing to add to the case, and that her testimony only would have been cumulative of that of the other witnesses. He also

---

[17] These witnesses, however, provided somewhat conflicting testimony with respect to when the defendant left the club.

[18] The defendant's investigator testified that she had attempted to reach Cindy Castro by telephone on the eve of trial for the purpose of serving her with a subpoena, but that the investigator had been informed by the person answering the telephone that Cindy Castro was out of town. The state, however, elicited testimony from the investigator indicating that she had not sought vigorously to locate Cindy Castro.

reminded the jury of the investigator's unsuccessful attempt to locate and subpoena Cindy Castro.

In these circumstances, we perceive no reasonable likelihood that the trial court's *Secondino* instruction harmed the defendant. In light of the testimony adduced by the defendant in support of his alibi defense, the jury had a full opportunity to evaluate the defendant's claim. Moreover, the defendant aggressively cross-examined the two victims, whose versions of the events remained consistent in all material respects. The jury obviously credited the eyewitness testimony of the two victims and rejected the testimony of the defendant and his three alibi witnesses. The defendant has not demonstrated that the jury's evaluation of that evidence would have been different had the court not given the *Secondino* instruction.

The judgment of the Appellate Court is affirmed.

In this opinion BORDEN, MCDONALD, PETERS and MENT, Js., concurred.

CALLAHAN, C. J., concurring. I concur with the result reached in the majority opinion. I write separately, however, because I do not think it is either necessary or desirable to require a party who intends to mention during closing argument the failure of an adversary to call a witness to notify the court and the opposing party in advance. It seems to me that it is always a proper argument to point out a lack of evidence and, as long as the jury is not asked to draw an inference, it is fair comment to bring to the jury's attention the absence of a witness to support the opposition's theory of the case.

BERDON, J., concurring and dissenting. I am pleased that my colleagues in the majority have finally decided to join my long-standing opposition to the *Secondino* rule, pursuant to which the jury in a criminal trial is

authorized to infer that the testimony of an absent witness would have been unfavorable to the accused.[1] See, e.g., *State* v. *Taylor*, 239 Conn. 481, 507, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997) (*Berdon, J.*, dissenting) ("the time has come for this court to discard . . . the *Secondino* rule"); *Tianti* v. *William Raveis Real Estate, Inc.*, 231 Conn. 690, 706 n.1, 651 A.2d 1286 (1995) (*Berdon, J.*, dissenting) (critical of *Secondino*); *State* v. *Ross*, 230 Conn. 183, 329, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995) (*Berdon, J.*, dissenting in part, on *Secondino* issue); see also C. Tait & J. LaPlante, Connecticut Evidence (Sup. 1999) § 11.5.4, pp. 219–20 (critical of *Secondino*). I write separately because I do not agree with the majority's conclusion that the *Secondino* instruction in the present case was harmless.

Although it took this court five years after I first criticized *Secondino* to discard the rule, the mischief it has caused is frightening. In *State* v. *Ross*, supra, 230 Conn. 324, for instance, I dissented from the majority's approval of a *Secondino* instruction authorizing the jury to draw an adverse inference from the fact that the defendant did not call as witnesses two of the four psychiatrists who examined him in order to evaluate his insanity defense.[2] Worse, the majority gave its blessing to the trial court's admonition that the jury should "*[l]isten carefully to [the Secondino instruction]. It's not a very usual or an easy concept.*" (Emphasis in original.) Id., 332 (*Berdon, J.*, dissenting). Because the court found no fault with the *Secondino* instruction in

---

[1] See *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 675, 165 A.2d 598 (1960).

[2] Significantly, this court has held that the attorney-client privilege bars the state from calling such experts as witnesses. See *State* v. *Toste*, 178 Conn. 626, 628, 424 A.2d 293 (1979) (reversible error to allow state to call psychologist who examined defendant at request of defendant's attorney).

*Ross*, the defendant in that case faces the death penalty in the wake of the new dispositional trial that this court ordered.

Speaking through then Chief Justice Peters, the *Ross* court justified the *Secondino* charge on the following grounds: "[T]he *Secondino* charge serves important evidentiary interests. In contradistinction to an invocation of privilege, the *Secondino* inference derives from the maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other side to have contradicted. . . . *State* v. *Shashaty*, 205 Conn. 39, 44, 529 A.2d 1308 (1987), cert. denied, 484 U.S. 1027, 108 S. Ct. 753, 98 L. Ed. 2d 766 (1988). Permitting consideration of all relevant evidence that bears a reasonable assurance of reliability advances the truth finding function of the jury." *State* v. *Ross*, supra, 230 Conn. 214–15.

Fortunately, my colleagues in the majority now recognize the injustice of permitting the jury to base a conviction upon inferences extracted from the imagined testimony of an absent witness. Unfortunately, this belated recognition comes too late for defendants such as Michael Ross. Nevertheless, at least the court has today laid the groundwork to prevent similar injustices from occurring in the future.

That said, I dissent from the majority's determination that the *Secondino* instruction in the present case inflicted no harm upon the defendant. I am well aware that "the defendant must show that the [*Secondino*] charge was likely to have affected the verdict." *State* v. *Shashaty*, supra, 205 Conn. 44. It is apparent to me that the defendant has satisfied this burden.

First, there was not a shred of forensic evidence that connected the defendant to the crime. The knife used in the assault did not belong to the defendant, and the

defendant's fingerprints were nowhere to be found.[3] Notwithstanding the absolute absence of physical evidence, the jury convicted the defendant. It is apparent to me that the *Secondino* instruction "likely . . . affected [this] verdict." Id.

Second, several alibi witnesses unequivocally testified that the defendant did not commit the assault with which he was charged. The trial court essentially instructed the jury that it could infer that the testimony of *another* witness—whom the defendant did not call— would have cast doubt upon the defendant's alibi. The harm that inheres in this instruction is self-evident. The trial court authorized the jury to discredit the testimony of the defendant's alibi witnesses, based on nothing more substantial than the fact that another witness had failed to testify. In short, the trial court encouraged the jury to reject the defendant's alibi. If this kind of encouragement from the trial court is "harmless," then I must not understand the meaning of that word.

In addition, one of the witnesses who identified the defendant as the assailant was a convicted felon. In contrast, two of the defendant's three alibi witnesses had no criminal records whatsoever, let alone felony records. At trial, the state conceded that credibility was "really probably the key issue or the essential focus . . . ." By instructing the jury that it could draw selective inferences in order to credit the testimony of a convicted felon and discredit the testimony of two law

---

[3] More specifically, the assailant touched a knife and a beer bottle, and the defendant's fingerprints were not found on either of these two items. Nor were the defendant's fingerprints found in the victim's car, which the assailant also touched.

abiding witnesses, the trial court encouraged the jury to kick the legs out from under the defendant's alibi.[4]

The majority's approach to cases such as the present one resembles a game with arbitrary rules and vertiginous stakes. The game is played something like this. To the trial court and to prosecutors, the majority says—with a conspiratorial wink—"you shouldn't have done that." To the defendant, the majority says "the trial court made a mistake, but—we're sorry—the mistake was harmless." As for the interests of justice, the majority says nothing at all.

Accordingly, I dissent.

[1] The majority emphasizes the following remarks that defense counsel made at closing argument: (1) that an investigator unsuccessfully attempted to locate and subpoena the missing witness; and (2) that the missing witness' testimony would have been cumulative. What did the majority expect defense counsel to say? More to the point, I am bewildered by the majority's apparent belief that the jury would elevate the argument of defense counsel over a subsequent instruction administered by the court.

