[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 8984
Samantha C. is the six year old daughter of Shellie C. and Jeffrey C. The parents are married to each other. Samantha has been in foster care for 4 ½ years. The commissioner of the Department of Children and Families (hereafter DCF or the department) petitions to terminate the parental rights of Samantha's parents (the respondents)
The respondent mother is 25 years old. Her mother died in a motor vehicle accident when she was eighteen months old. Thereafter, she was raised by her maternal grandparents. She has not had contact with her father since she was two or three years old. When she was seventeen, her grandparents told her to leave the home.
Both respondents quit high school shortly before graduation. They met in 1994 and have been romantically involved intermittently since.
The respondent father is 28 years old and has a well known reputation for truculence and contentiousness. Although he does not have a lengthy history of criminal convictions, the local police have responded to situations in which he has been involved over thirty-five times over the years. The court infers that these incidents involved domestic disputes or low-level confrontations with other persons. Such incidents continued after the filing of the petition. Three months before trial, the father was involved in a dispute during which he threw a rock through the window of his brother's tractor. Although the mother also has been the subject of many incidents to which the police have responded, she does not have the father's reputation for belligerence.
On April 1996, Samantha was born to the respondents. Before her first birthday, the respondents were having physically violent altercations. DCF became involved and offered the mother case management services and an in-home parent-aide to address basic child care tasks and safety issues. The parents' conflict reached its apex on December 17, 1997 when the father hijacked the mother's truck while Samantha was in it and while the mother was partially hanging out of the passenger side. He then recklessly drove off as the mother attempted to kick out the windshield. As a result of this incident the father was arrested and convicted of unlawful restraint. He was given a five year suspended sentence. Three days after the incident, DCF inspected the mother's apartment and found it to be inappropriate due to uncleanliness. DCF exercised a ninety-six hour hold over Samantha and subsequently was granted an order of temporary custody by the court. The court also issued specific steps to the respondents, who were offered supervised visitation with their daughter. On April 9, 1999, the court adjudicated Samantha a neglected CT Page 8985 child and again issued specific steps to the parents.
In February 1998, the mother was involved in a serious motor vehicle accident for which she was hospitalized for three days. For some time thereafter she had to wear a "halo device" to facilitate the healing of her neck. Also in 1998, while a full protective order was in effect, the mother conceived a child by the father. On April 15, 1999, while the protective order was extant, the respondents married so that the mother would not have to testify against the father in connection with his prosecution for a domestic violence crime. On June 4, 1999 the respondents had another child, Lewis C.
After two brief placements, Samantha was placed in the care of a maternal great aunt. Although the mother was offered unrestricted visitation in the presence of the aunt, she rarely saw Samantha between the time DCF took custody of her and early 2000.
While she was living in the home of her great aunt, Samantha was sexually abused by another relative in the household who was a convicted felon. On January 24, 2000, Samantha was removed from that home and placed in another foster home where she resided until March 19, 2001. That foster parent tried to facilitate Samantha's reunification with the respondents, and permitted parental visits in the foster home. The respondents were appropriate during these visits. The foster mother observed that Samantha was very attached to her mother. However, at least in early 2001, when DCF was pursuing reunification, Samantha seriously acted out before and after visits. As a result, the foster mother was unwilling to adopt Samantha and asked that she be removed. On April 24, 2001, Samantha was placed in her current, pre-adoptive home.
Between December 1997 and late-1999, the respondents were infrequently visiting Samantha and were not following through on DCF's referrals to service providers. In the opinion of the DCF social worker, there was no parent-child relationship between Samantha and her parents. Moreover, Samantha and her mother were interacting little during visits. The father was at times ambivalent about reunifying the family. His anger continued unabated. For all of these reasons, DCF filed a petition to terminate the respondents' parental rights in February 2000.
Nevertheless, during 2000, the prospects for eventual reunification began to improve. The father did well in his alternate incarceration program to which he was ordered as a condition of probation. He maintained employment and completed weekly substance abuse and anger management groups in which he participated appropriately. He also attended a Fatherhood Initiative group. He consistently tested negative for drugs. Each of the respondents engaged in individual counseling in 2000 and CT Page 8986 seemingly made good progress therein. They also engaged in couples' therapy. On April 7, 2000, the therapist recommended removal of the protective order and reunification with Samantha. For these reasons, DCF withdrew its termination petition. However, during this same period, when Samantha returned from visits with the respondents she told her foster mother that her parents were yelling at each other and that, at least on one occasion, her father had struck her mother.
On August 21, 2000, Ann Tuller, President of AMPS, Inc. which had provided the respondents with supervised visitation with Samantha since April 2000, recommended reunification as soon as possible. Tuller opined that both respondents had progressed in their relationship and in their parenting skills, and that Samantha, who had initially demonstrated anger with her parents, was now more trusting of them.
DCF prepared to reunify the family in the Fall of 2000. Samantha's therapist supported this decision. Samantha had been visiting at her parents' home and staying overnight with DCF's approval. In October 2000, however, DCF learned that the mother had suddenly taken Lewis and left the father. At around this time. Samantha's foster mother saw a large bruise on the mother's neck. Samantha was reporting that her father was "bad" and the mother admitted that there were problems in the marriage.
The mother had little contact with DCF during this time and was not seeing Samantha. The father believed that she had been unfaithful. The mother was uncertain as to whether she would seek a divorce or pursue reunification with Samantha at some future time. When DCF offered the mother individual visits with Samantha, without the father, the mother was ambivalent and said she would have to consult the father. The father offered to take Samantha but was also clear that he was unable to carry out some basic parenting functions, such as giving Samantha a bath and making doctor appointments. DCF considered providing the father with parent aide services. Intensive Family Preservation (IFP) clinicians from United Services, Inc. observed that the father had a large support network in his family. IFP also reported that many of the father's siblings as well as Samantha's paternal grandfather lived nearby and had offered their support.[1] DCF again referred the respondents to couples' counseling and to IFP.
DCF continued to work toward reunification. Concededly, the parents did have a bond with Samantha. In December 2000, the respondents resumed living together as a couple. In January 2001, they had Samantha for a long weekend on paternal grandfather's farm and were to bring her to school Monday morning. Because of a snow storm, school was cancelled. The parents, however, did not contact DCF about where they should bring Samantha that day. A DCF social worker and an investigator visited the CT Page 8987 parents later in the day and found that the parents' house filthy, with feces on the floor in an area where Lewis played. They also observed that Samantha had a large bruise on her leg. The respondents ascribed the bruise to Samantha's being kicked or knocked down by a calf on their farm.
In February 2001, DCF again filed a petition to terminate parental rights. That month IFP observed that the respondents had an immature and unstable relationship marked by the following pattern: the father tried to control the mother, the mother tolerated this for a time but then wanted her freedom. The couple separated, then reconciled and the cycle repeated. In early 2001, the respondents stated that they would be together as a couple for years but would probably break up from time to time. The father stated that their relationship had nothing to do with reunification with Samantha and that even if he and the mother were not together as a couple they would agree on how they could both parent their children.
During 2001, the respondents continued to visit Samantha, albeit in a supervised setting. The respondents were generally appropriate during the visits. However, Samantha started withdrawing from the father, avoiding interactions with him, and he with her. At an administrative case review on September 13, 2001, the father admitted that the visits were not going well. The mother reported that she had again separated from the father and was living with a friend. She thought this separation was permanent and she did not want the father to know where she was staying. The mother claimed that she was in therapy. The father did not claim to be participating in any services, and both parents refused to sign releases.
During early 2001, Samantha began urinating and defecating in her clothes at school and at home. Her behaviors were sufficiently troublesome that her foster mother asked that she be given another placement. On April 24, 2001, Samantha was moved to a "legal risk" pre-adoptive home, where she remains. The behaviors that her prior foster parent found troublesome have subsided as the respondents were restricted to supervised visits and Samantha settled into her new home.
The case was tried to the court. The court heard testimony from seven witnesses, including Samantha's current and prior therapist and a psychologist appointed by the court to evaluate the respondents. The court also received thirty documents in evidence. The respondents elected not to testify.
 I
"To terminate parental rights under § 17a-112 (c), now (j), the CT Page 8988 department is required to prove by clear and convincing evidence that it has made reasonable efforts to reunify the children with the parent unless the court finds that the parent is unable or unwilling to benefit from reunification efforts. In accordance with § 17a-112. . ., the department may meet its burden concerning reunification in one of three ways: (1) by showing that it made such efforts, (2) by showing that the parent was unable or unwilling to benefit from reunification efforts or (3) by a previous judicial determination that such efforts were not appropriate. . . .
"Turning to the statutory scheme encompassing the termination of parental rights of a child committed to the department, the statute imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . [R]easonableness is an objective standard . . . and whether reasonable efforts have been proven depends on the careful consideration of the circumstances of each individual case." (Citations omitted; internal quotation marks omitted.)In re Ebony H., 68 Conn. App. 342, 348-49, 789 A.2d 1158 (2002). Consequently reasonable efforts must be specifically tailored to fit the circumstances of each family, and must be designed to eliminate those conditions which led to removal of the child from his or her parent or parents. In re Dino E., 6 Cal.App.4th 1768, 1777, 8 Cal.Rptr.2d 416
(1992).
The issues that brought Samantha into the care of DCF in 1997 were her parents' marital problems combined with their mental health issues and parenting deficiencies. DCF offered both parents parenting classes, psychological evaluations, individual counseling, family counseling, Intensive Family Preservation services, an in-home parent aide, home visits with Samantha, supervised visitation and case management services. It planned two reunifications. While the court finds that the second reunification effort, in January 2001, was prematurely aborted, the services offered by DCF were well tailored to the issues that brought Samantha into its care. In the "particular set of circumstances" presented here, DCF did everything reasonable to reunite the family. The court finds by clear and convincing evidence that DCF used reasonable efforts to reunify the family.
 II
The sole ground of the petition is that the respondents have failed to achieve sufficient personal rehabilitation. General Statutes § 17a-112
CT Page 8989 (j)(3)(B) "allows for the involuntary termination of parental rights when the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . . Personal rehabilitation refers to the reasonable foreseeability of the restoration of a parent to his or her former constructive and useful role as a parent, not merely the ability to manage his or her own life. . . .
The statute does not require the parent to be able to assume full responsibility for a child, without the use of available support programs. . . . Our Supreme Court has held that § 17a-112 (b)(2) [now § 17a-112 (j)(3)(B)] requires the trial court to analyze the respondent's rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time." (Citations omitted; internal quotation marks omitted.) In re Ashley S., 61 Conn. App. 658, 665,769 A.2d 718, cert. denied, 255 Conn. 950, 769 A.2d 63 (2001); see In reDaniel C., 63 Conn. App. 339, 353-54, 776 A.2d 487 (2001).
"In determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in the specific expectations ordered by the court or imposed by the department." (Citations omitted.) In re Vincent D.,65 Conn. App. 658, 670, 783 A.2d 534 (2001).
A claim of failure to rehabilitate implicates a judicially created exception to the Practice Book rule, § 33-3 (a), that "[i]n the adjudicatory phase, the judicial authority is limited to events preceding the filing of the petition or the latest amendment." "Despite Practice Book § 33-3(a) and case law regarding termination proceedings generally, we have determined that with regard to termination petitions brought under § 17a-112 (c)(3)(B), [now § 17a-(j)(3)(B)], the trial court may in the adjudicatory phase, properly consider facts and events that occur after the filing date of the petition in determining whether a respondent has achieved a sufficient degree of personal rehabilitation within the meaning of that statute. . . . In the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Citations omitted; emphasis in original.) In re Latifa K., 67 Conn. App. 742, 748-49, 789 A.2d 1024
CT Page 8990 (2002).
To be sure, this case does not bear many of the usual earmarks present in termination of parental rights proceedings. Neither parent has a history of substance abuse or of physically abusing children. Neither parent suffers from serious mental illness such as bi-polar disorder, although there was evidence that the respondents have emotional problems. The parents are married, the father works and the family has a home. This, at least nominally, is a nuclear family.
Certainly, the respondents have a bad marriage, the father is quarrelsome and the mother is withdrawn. But "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. . . ." Inre Baby Girl B., 224 Conn. 263, 279-80, 618 A.2d 1 (1992). The termination of parental rights, "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his [or her] parent . . . is a most serious and sensitive judicial action. . . ." (Citations omitted.) In re Jonathan M.,255 Conn. 208, 231, 764 A.2d 739 (2001). "Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. . . . Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody." (Citations omitted; internal quotation marks omitted.) In reBaby Girl B., supra, 224 Conn. 279. Neither, however, does the termination of parental rights for failure to rehabilitate require a particular species of pathology.
The court received expert opinion evidence from several witnesses. In March 1998, the mother underwent a psychological evaluation by Dr. Bruce Freedman. Dr. Freedman reported that the mother showed a combination of emotional and behavioral problems which interfered with her ability to safely parent a child. He recommended that she submit to individual counseling to address these issues. The mother, however, failed to comply with this recommendation at that time. Notably, Dr. Freedman did not testify at trial.
On June 24, 1999, Dr. Robert Meier, the court appointed psychologist of many years experience, evaluated both respondents. He found the mother to "be quite guarded and showed limited emotion or enthusiasm, even when CT Page 8991 seeing her daughter. She was not inappropriate, but her affect seemed to be blunted." (Exhibit 6, p. 7.) Dr. Meier also found that the mother's "approach to problems is quite immature and naive, and there are concerns as to whether she can take on the major work and effort that will be required to reestablish a relationship with her daughter, Samantha, especially with a infant in her care. She will need significant guidance, training, and supervision for a period of time to insure she does not place her daughter at risk in the future. In addition, if she plans to remain in a relationship with [the father], there will have to be assurances that the child is not exposed to further violence between him and mother." (Exhibit 6, p. 8.) Indeed, Meier opined in 1999 that both parents "have limited insight into the problems facing them. They tend to minimize the poor judgment and the risks to the child of their actions." (Exhibit 6, p. 10.) He "recommended that the child remain in placement until the parents demonstrate [that] they have addressed the problems leading to violence, the legal issues are settled, and they have taken the expected step to reestablish a relationship with their daughter." (Exhibits 6, p. 12.)
Joan Prior, a licensed clinical social worker with fourteen years experience, was Samantha's therapist between April 2000 and April 2001. When Samantha began therapy, Prior gave her a preliminary diagnosis of Post Traumatic Stress Disorder (PTSD) and a "rule out" diagnosis of reactive attachment disorder.[2] The PTSD caused Samantha to be hyper-vigilant, jumpy, startling easily, emotionally numb at times ("frozen and unresponsive"), avoidant of trauma, irritable and susceptible to nightmares. Samantha also was severely delayed in her speech.
Prior testified that the mother, judging from her interactions with Samantha, was aloof, depressed and not responsive to Samantha. In addition, Samantha was afraid of her father. Prior stated that in January 2001, when DCF was planning to reunite Samantha with the respondents, Samantha was more tearful and sad. She opined that as of May 2001, Samantha had a depressive disorder, "not otherwise specified"; an adjustment disorder with depressed mood, but that her PTSD had diminished. Also, her speech had significantly improved. Moreover, at the end of her treatment with her, Prior stated that Samantha was able to express a range of emotions, whereas at the beginning of her therapy she was, in Prior's words, "emotionally numb." As of May 2001 reunification was not appropriate, according to Prior. The respondents were immature, their relationship was unstable, their conflicts were too frequent and the mother's own needs had not been met. This environment, Prior concluded, would cause regressive behavior in Samantha and reactivate her PTSD. Samantha, she emphasized, requires a safe, nurturing, predictable and consistent parent. CT Page 8992
Catherine Cooper Jordan, a licensed clinical social worker and Samantha's therapist between September 2001 and January 2002, echoed many of these observations and diagnosed Samantha as suffering from reactive attachment disorder. The court, however, ascribes less weight to her opinions for several reasons. First, her experience was limited (6 ½ years) compared to that of Ms. Prior and Dr. Meier. Second, Cooper Jordan was employed by DCF at the time of trial and had been seeking employment with DCF for over two years. Third, Cooper Jordan was Samantha's therapist for a relatively brief time. Finally, her demeanor as an expert witness did not impress the court. The court, however, does credit Cooper Jordan's opinion that if Samantha were in a "yelling environment" her behaviors would deteriorate. Also, the court credits Cooper Jordan's statement of fact that Samantha told her that her parents fight a great deal and that her father "screams."
Dr. Meier again evaluated the respondents and conducted a parent-child interaction study in 2001. He authored two reports on Samantha that year and testified at trial. Meier found that the respondents did not manifest disorders or problems as serious as those suggested in the court documents. According to Meier, the respondents acknowledged problems in their marriage, denied that it would be marked by separations in the future and acknowledged that couples' and family counseling would be helpful. In effect, the parents expressed a desire to remain together and address their difficulties. Samantha was not afraid of either parent — when she saw her father she went to him and gave him a hug, then hugged her mother — and there was an obvious bond between parent and child. Samantha spontaneously sat on her parents' laps and showed affection.[3]
Meier observed that some of the information provided by service providers and court documents was not consistent with the results of his evaluation. His evaluation did not support a diagnosis of depression by the mother. The suggestion by DCF that the child had little positive feelings for her parents was certainly contrary to what he observed. Moreover, he found the rationale for the petition to terminate parental rights unclear because DCF had recommended reunification as recently as February 2001.
In his second and final report of 2001, dated November 27, 2001, however, Meier conceded that: "The lack of stability and consistency in the home and in the parent's relationship seriously limits their ability to demonstrate that they can provide a safe and secure home for their daughter." (Exhibit 8, p. 2.) He also found that "[t]he instability within the family has apparently increased" since his evaluation of the family in August 2001. (Exhibit 8, p. 2.) Meier concluded that the CT Page 8993 respondents' "own needs and conflicts have interfered with a concentrated effort to meet the needs of Samantha." (Exhibit 8, p. 3.) He also opined that given the length of time Samantha had been in foster care, she required permanency immediately.
Meier found that while Samantha had some symptoms associated with PTSD, she did not have them to such an extent as would warrant a diagnosis of PTSD. Moreover, there was other evidence that while Samantha may have regressed in her symptoms in early 2001, those symptoms subsided later in 2001. Meier also acknowledged that children with PTSD will regress with stress.
The mother offered in evidence a letter dated November 6, 2001, from her therapist, Virginia Lawless, MSW, of North Central Counseling Services. In the letter Lawless discloses that the mother had recently sustained additional stress because DCF was also investigating whether Lewis was a neglected child. In September 2001, the mother informed Lawless that she and the father had again decided to separate. Lawless states in her letter that the mother "was saddened at the fact, but seemed resolved to do whatever it would take to move forward for the sake of her younger child. She tended in that and subsequent sessions to say little about Samantha, which I attributed to her sense that there was little she could do to resolve that situation, and resigned to the fact that there was no chance for reunification with her daughter." (Exhibit AA, p. 2.) Lawless also opined that the mother was "resourceful and appears to function more effectively in the absence of her husband" but had difficulty solving problems on her own. (Exhibit AA, p. 2.)
The father submitted a letter from his therapist, dated February 21, 2002, which states that the father had no noteworthy psychiatric symptoms, though he did "appear to have some mild cognitive deficits and/or learning disabilities and this may contribute to his past poor judgment concerning childcare." (Exhibit E.) The therapist noted that the father had completed anger management and parenting classes in accordance with DCF's requirements and that his attending additional parenting classes would be helpful to reinforce what he had learned. The therapist also opined that the father's "marital situation appears to be relatively stable compared to the past." (Exhibit E)
"The psychological testimony from professionals is rightly accorded great weight in termination proceedings." (Internal quotation marks omitted.) In re John G., 56 Conn. App. 12, 24, 740 A.2d 496 (1999). While the psychological evidence here was in some respects conflicting, the following facts were proved by clear and convincing evidence.
Prior to her recent pre-adoptive placement, Samantha had emotional and CT Page 8994 behavioral problems.[4] Samantha's multiple placements and her sexual abuse in a relative foster placement contributed to her emotional and behavioral problems. It was, however, her parents' issues that brought her into DCF's care. During the first two years of Samantha's placement in foster care, her parents visited her little. From the end of 1999 to October 2000, the respondents' relationship appeared to have stabilized. In fact, it had not. Samantha's emotional and behavioral problems subsided when DCF abandoned reunification attempts and when Samantha was placed with her present, preadoptive parents. Thus, when Meier observed Samantha, her behavioral and emotional problems were in remission. These problems, however, would resurface and be aggravated if Samantha were returned to an environment marked by much yelling and instability. Even assuming that the respondents could, individually, parent Samantha adequately, together they have chosen to maintain a relationship, and a lifestyle, that is chaotic, unstable and punctuated by domestic violence. Notably, Samantha has been in foster care for 4 ½ years, far longer than is now prescribed by state law; General Statutes § 17a-111a; or urged by the Federal Adoption and Safe Families Act of 1997, 42 U.S.C. § 671 et seq.[5] Thus, the respondents have had more than enough time to rehabilitate. The court finds, as Dr. Meier opined, that all time for the respondents to rehabilitate has expired.
It may well be, as the evidence suggests, that the respondents' younger child, Lewis, has not manifested any ill-effects from his parents' tumultuous relationship. That a parent can care for another child of another age, while not irrelevant, is not the test prescribed by §17a-112 (j). See In re Sheila J., 62 Conn. App. 471, 481, 771 A.2d 244
(2001). Since 1999, the Appellate Court has repeatedly emphasized that in assessing whether a parent has achieved sufficient personal rehabilitation for purposes of § 17a-112, "[t]he critical issue is whether the parent has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) In reMariah S., 61 Conn. App. 248, 261, 763 A.2d 71 (2000), cert. denied,255 Conn. 934, 767 A.2d 104 (2001); accord, In re Gary B.,66 Conn. App. 286, 292, 784 A.2d 412 (2001); In re Amneris P.,66 Conn. App. 377, 384, 385, 784 A.2d 457 (2001); In re Daniel C.,63 Conn. App. 339, 354, 776 A.2d 487 (2001); In re Sheila J.,62 Conn. App. 470, 480, 771 A.2d 244 (2001); In re Sarah Ann K.,57 Conn. App. 441, 448, 749 A.2d 77 (2000); In re Shyliesh H.,56 Conn. App. 167, 180, 743 A.2d 165 (1999); In re Danuael D.,51 Conn. App. 829, 840, 724 A.2d 546 (1999). Neither individually nor as a couple have to the parents gained that ability.
As this court has recently stated: "[A] parental history of engaging in relationships marked by domestic violence are parental deficiencies requiring rehabilitation which, if unsuccessful, may warrant the CT Page 8995 termination of parental rights. . . .
"With respect to domestic, or family, violence, the legislature has clearly spoken. General Statutes § 17a-106b (a) declares: `The state of Connecticut finds that family violence can result in abuse and neglect of the children living in the household where such violence occurs and that the prevention of child abuse and neglect depends on coordination of domestic violence and child protective services.' In other legislation as well, the General Assembly has recognized that domestic violence in the home adversely affects children. See, e.g., General Statutes §§17a-106c, 46b-38g.[6]
"A parent's propensity to engage in relationships marred by domestic violence is an oft-cited fact in findings of failure to rehabilitate and termination of parental rights. See, e.g., In re Daniel C., supra,63 Conn. App. 342, 345, 354-55; In re Sheila J., supra,62 Conn. App. 480-81; In re Stanley D., 61 Conn. App. 224, 232, 763 A.2d 83
(2000); In re Steven N., 57 Conn. App. 629, 631, 749 A.2d 678 (2000); Inre Michael L., 56 Conn. App. 688, 691, 745 A.2d 847 (2000); In re AntonyB., [54 Conn. App. 463, 475, 735 A.2d 893 (1999)]; In re Galen F.,54 Conn. App. 590, 596, 737 A.2d 499 (1999); In re Danuael D.,51 Conn. App. 829, 834, 724 A.2d 546 (1999); In re Helen B.,50 Conn. App. 818, 821, 830, 719 A.2d 907 (1998); In re Jessica B.,50 Conn. App. 554, 563, 718 A.2d 997 (1998)." In re Destiny Q., Superior Court, Child Protection Session at Middletown (November 19, 2001, Levin, J.). Over a long period of time, the respondents have manifested an inability or unwillingness to extricate themselves from their tumultuous, abusive and unstable relationship, disqualifying them as caretakers for Samantha. They have, moreover, shown an inadequate commitment to being Samantha's caretakers.
The respondents, both of whom were present in the courtroom throughout the trial, elected not to testify. The court infers from their silence that they are continuing their volatile relationship and are unable to care for Samantha's needs.
"The failure to offer such evidence is not proof of any specific fact, but it does permit the inference that the evidence of the witness would be unfavorable to the party's cause to be weighed with the entire evidence in the case, and not infrequently this inference when so weighed may tip the scales against the party in default." Ezzo v. Geremiah,107 Conn. 670, 677, 142 A. 461 (1928). This has been the rule in Connecticut for over a hundred years. See Throckmorton v. Chapman,65 Conn. 441, 454-55, 32 A. 930 (1895). The rule applies in both jury and court cases. See, e.g., Olin Corp. v. Castells, 180 Conn. 49, 53-54,428 A.2d 319 (1980) (upholding drawing of the inference in case tried to CT Page 8996 the court).
An adverse inference does not assist a party in establishing a prima facie case; Middletown Trust Co. v. Bregman, 118 Conn. 651, 657-58,174 A. 67 (1934); but can only be used by the trier in weighing the evidence and determining whether the ultimate burden of persuasion has been satisfied. Streicher v. Resch, 20 Conn. App. 714, 717, 570 A.2d 230
(1990). Once a prima facie case is made out, however, "[i]t is an ancient maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the power of the other side to have contradicted." Secondino v. New Haven Gas Co.,147 Conn. 672, 674, 165 A.2d 598 (1960), overruled in part on other grounds, State v. Malave, 250 Conn. 722, 737 A.2d 442 (1999) (en banc), cert. denied, 528 U.S. 1170, 120 S.Ct. 1195, 145 L.Ed.2d 1099 (2000). "[T]here is a logical nexus between the failure to call an available witness and drawing an adverse inference against the party who fails to call that witness." State v. Santangelo, 205 Conn. 578, 600, 534 A.2d 1175
(1987). As Justice Brandeis stated: "Silence is often evidence of the most persuasive character." Bilokuinsky v. Tod, 263 U.S. 149, 153-54
(1923).
In Ezzo v. Geremiah, supra, 107 Conn. 677, the Supreme Court adopted the rule permitting the trial judge in a jury case to instruct the jury that it could draw an adverse inference against a party who was available and who the party would have naturally produced. The same rule, permitting such a jury instruction in a criminal case, was expressly adopted in State v. Annunziato, 169 Conn. 517, 538-39, 363 A.2d 101
(1975), overruled in part on other grounds, State v. Pinnock,220 Conn. 765, 791, 601 A.2d 521 (1992). Both the rule permitting the trier to draw an adverse inference and the rule allowing the court to charge a jury that it may draw such an inference came to be known as theSecondino-rule. See Blake v. Blake, 211 Conn. 485, 493, 560 A.2d 396
(1989) ("The Secondino rule is applicable to court trials.").
In State v. Malave, supra, 250 Conn. 722, the Supreme Court abolished both aspects of the Secondino rule in criminal cases. In 1998, the General Assembly abolished that aspect of the Secondino rule that authorized a trial judge in a civil action to charge a jury on the adverse inference it could draw from the failure of a party to call a witness. That enactment, Public Acts 1998, No. 98-50, now codified as General Statutes § 52-216c, provides: "No court in the trial of a civil action may instruct the jury that an inference unfavorable to any party's cause may be drawn from the failure of any party to call a witness at such trial. However, counsel for any party to the action shall be entitled to argue to the trier of fact during closing arguments, except where prohibited by section 52-174, that the jury should draw an adverse CT Page 8997 inference from another party's failure to call a witness who has proven to be available to testify." In State v. Malave, supra, 250 Conn. 739 n. 16, the court acknowledged the difference between the rule it was enunciating for criminal cases and the rule that the General Assembly had legislated for civil actions.[7]
By preserving the privilege of counsel to argue that the jury should draw an adverse inference from the failure of another party to call an available witness, the legislature in § 52-216c acknowledged the continued propriety of the trier drawing an adverse inference in civil actions, since counsel in argument may not present matters which the trier has no right to consider; State v. Alexander, 254 Conn. 290, 302,755 A.2d 868 (2000); or use "considerations which the law forbids." (Internal quotation marks omitted.) Worden v. Gore-Meenan Co.,83 Conn. 642, 653, 78 A. 422 (1910).
A proceeding to terminate parental rights has been repeatedly held to be a civil, not criminal, proceeding. South Windsor v. Police Union Local1480, 255 Conn. 800, 826, 770 A.2d 14 (2001); In re Baby Girl B., supra,224 Conn. 282; In re Christopher A., 22 Conn. App. 656, 663 A.2d578 A.2d 1092 (1990); see Practice Book § 34-2.[8] While "the civil label is not always dispositive"; Allen v. Illinois,478 U.S. 364, 369 (1986); it is entitled to due consideration.United States v. Ward, 448 U.S. 242, 248 (1980). Moreover, both the text of the termination statute and the purpose of the statute confirm its civil, remedial nature.
The purpose of the "sanction" of terminating an individual's parental rights clearly is remedial in nature. General Statutes § 17a-101 (a) highlights the public policy of this state as it pertains to children: `To protect children whose health and welfare may be adversely affected through injury or neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family.'
Our case law has articulated similar remedial purposes. `The primary concern of [the department] is the safety of [the child]. . . . Where appropriate, the agency can and must take unilateral action either to reunite families or to terminate parental rights as expeditiously as possible to free neglected children for placement and adoption in stable family settings.' (Internal quotation marks omitted.) In re ChristineF., 6 Conn. App. 360, 368, 505 A.2d 734, cert. denied, 199 Conn. 808, CT Page 8998 809, 508 A.2d 769, 770 (1986); see also In re Juvenile Appeal (85-BC),195 Conn. 344, 352, 488 A.2d 790 (1985) (established public policy of state is to protect children); State v. Anonymous, [179 Conn. 155,170-71, 425 A.2d 939 (1979)] (same)." In re Shane P., 58 Conn. App. 244,258-59, 754 A.2d 169 (2000).
Since a proceeding to terminate parental rights is a civil proceeding, the prohibition in State v. Malave, supra, 250 Conn. 722 against drawing an adverse inference from a defendant's failure to testify does not apply. Notably, the rule allowing the trier to draw an adverse inference from party's failure to testify is common law based. Id., 738-39. Therefore, in the absence of any statute abolishing the adverse inference rule in civil proceedings such as petitions to terminate parental rights, it remains in tact. State v. Rivera, 250 Conn. 188, 194-95,736 A.2d 188 (1999).
In addition, even if § 52-216c is not applicable to termination of parental rights cases because such cases are not "civil actions" tried to a jury, the policy of that statute is applicable to parental termination cases by analogy. "`Plainly, every statute has some boundaries, and the question then arises whether, and when, it is appropriate to apply the statute, as a matter of common law, beyond its designated boundaries.' E. Peters, `Common Law Judging in a Statutory World: An Address,' 43 U.Pitt.L.Rev. 995, 998 (1982). In other contexts, [Connecticut courts] have used statutes as a useful source of policy for common law adjudication, particularly if there was a close relationship between the statutory and common law subject matters.' Fahy v. Fahy, 227 Conn. 505,514, 630 A.2d 1328 (1993); accord New England Savings Bank v. Lopez,227 Conn. 270 281, 630 A.2d 1010 (1993). . . ." State v. Kulmac,230 Conn. 43, 52, 644 A.2d 887 (1994) (applying rape shield statute to prosecutions for risk of injury); see also Normand Josef Enterprises,Inc. v. Connecticut National Bank, 230 Conn. 486, 501, 646 A.2d 1289
(1994) (collecting cases in which the Supreme Court applied the UCC to common law actions by analogy); Williams Ford, Inc. v. Hartford CourantCo., 232 Conn. 559, 586, 657 A.2d 212 (1995) (applying comparative negligence statute to negligence actions where only commercial losses are sustained).
The policy of § 52-216c is that counsel may argue that the trier should draw an adverse inference from the failure of a party to call a witness at trial, and the trier may draw such an inference, but the judge may not instruct a jury that it may draw an adverse inference. Parental termination cases, of course, are not triable to a jury in Connecticut. But like a civil action, a termination of parental rights proceeding is an adversarial proceeding, tried before a judge as an original matter. Indeed, that termination proceedings are tried not to a jury but to a CT Page 8999 judge schooled in the law provides greater assurance that the trier will not draw an adverse inference in inappropriate circumstances. Moreover, parents in termination of parental rights cases have a statutory right to court-appointed counsel. General Statutes § 46b-136.[9] This affords greater assurance that where a parent declines to testify, he or she will do so through an informed decision, cognizant that the trier may draw an adverse inference from that silence. The core policy of 52-216c
permitting the drawing of adverse inferences is appropriately applied to termination of parental rights cases.
Although proceedings to terminate parental rights implicate "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"; In re Baby Girl B., supra, 224 Conn. 279; the constitutional rights of criminal defendants are not automatically imported into such proceedings. In re Shane P., supra,58 Conn. App. 257-59; In re Quinn, 54 Mass. App. 573, 763 N.E.2d 573,578 (2002). Courts, including the United States Supreme Court, have upheld the drawing of adverse inferences from a party's silence in proceedings in which the party's liberty interests were implicated. SeeMinnesota v. Murphy, 465 U.S. 420, 435 n. 7 (1984) ("nothing in the federal Constitution would prevent a State . . . from using the probationer's silence as `one of a number of factors to be considered by the finder of fact' in deciding whether other conditions of probation have been violated."); Baxter v. Palmigiano, 425 U.S. 308, 317-19,96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (upholding the drawing of an adverse inference from inmate's silence at prison disciplinary hearing); UnitedStates v. Solano-Godines, 120 F.3d 957, 962 (9th Cir. 1997) ("Deportation proceedings are civil proceedings, and in such proceedings an immigration judge may draw an adverse inference from a defendant's silence in response to questioning.")[10] Specifically in termination of parental rights proceedings, several states have upheld the drawing of an adverse inference against a parent who fails to testify in his or her defense. Inre Quinn, 54 Mass. App. 117, 763 N.E.2d 573, 578-579 (2002); In reArielle LL, 741 N.Y.S.2d 339, 340 (2002); In the Interest of M.V.,253 Ga. App. 669, 672-72 n. 12, n. 13, 560 S.E.2d 125, 128 n. 12, n. 13 (2002); Matter of C.C., 907 P.2d 241, 244 (Okla.App. 1995); In re L.H. L.H., 634 A.2d 1230, 1234 (D.C.App. 1993); see also In re Felicia S., Superior Court, Juvenile Matters, Ninth District at Montville (May 21, 1993, Silbert, J.) (stating in dicta that an adverse inference may be drawn against respondent in termination of parental rights proceeding who fails to testify)
It is true that Practice Book § 34-1(f)[11] provides that parents may not be "compelled" to testify in proceedings such as a termination of parental rights. Drawing an adverse inference from a party's refusal to testify, however, is not compulsion to testify, at CT Page 9000 least where the party does not suffer an adverse adjudication "in consequence of silence automatically" and "without regard to other evidence. . . .". See Baxter v. Palmigiano, supra, 425 U.S. 317-19. In addition, neither the Practice Book rule nor any statute precludes the court from drawing an adverse inference against a parent, in appropriate circumstances, where he or she fails to testify. Where the legislature has intended that no adverse inference be drawn from a party's silence in juvenile proceedings, it has clearly said so. See General Statutes §46b-138a.[12] Here, it has not. That no such prohibition ought to be implied into the Practice Book rule is embodied in the principle that "[a]lthough the Superior Court is granted broad authority to promulgate rules, such rules shall not abridge, enlarge or modify any substantive right. Conn. Constit., art. V, § 1; General Statutes § 51-14
(a); Mitchell v. Mitchell, 194 Conn. 312, 324, 481 A.2d 1078 (1978); see also Practice Book § 1 [now § 1-1]." (Emphasis added.) Duve v.Duve, 25 Conn. App. 262, 267, 594 A.2d 473, cert. denied, 220 Conn. 911,597 A.2d 332 (1991), cert. denied, 502 U.S. 1114, 112 S.Ct. 1224,117 L.Ed.2d 460 (1992). Since the drawing of an adverse inference is not itself compulsion, to prohibit the drawing of such an inference would be an enlargement or modification of the right not to be compelled to testify.
For the foregoing reasons, the court holds that the common law rule permitting a trier in civil actions to draw an adverse inference from the failure of a party to call an available witness, including himself, remains the law in Connecticut and applies in proceedings to the terminate parental rights.
Here, whether the respondents had eliminated the upheaval in their home caused by the father's behavior and the mother's periodically fleeing the home to parts unknown, such that either or both could care for Samantha, was a central issue in the adjudicatory portion of the case. DCF presented evidence that the upheaval, indeed, was continuing. If the situation had changed, that evidence was uniquely within the power of the respondents to produce. With so much at stake, it was evidence that they naturally would have produced if they could have. They did not. Notably, the respondents were present in the courtroom throughout the trial.
Subsequent to DCF taking custody of Samantha in December 1997, the respondents did achieve a degree of personal rehabilitation, as DCF concedes. As the events in and after October 2000 reflect, however, the degree of rehabilitation was inadequate. This is not a case of "too little and too late." In re Sheila J., 62 Conn. App. 470, 771 A.2d 244
(2001). Rather, it is a case of too little much too late. The time for Samantha, a six year old girl, to enjoy permanency has long since past. After 4 ½ years, it would not be reasonable to afford the CT Page 9001 respondents further time to rehabilitate. By clear and convincing evidence the court finds that Samantha has previously been found to be neglected, has been in the care of DCF for at least fifteen months, and that the respondents have been provided with specific steps to facilitate her return, pursuant to General Statutes § 46b-129. Weighing the evidence in light of the failure of the respondents to testify to the contrary, the court finds by clear and convincing evidence that the respondents have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering Samantha's age and her needs, that they could assume a responsible position in her life.
 III A. Mandatory Findings
"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the parents' parental rights is not in the best interests of the child." (Internal quotation marks omitted.) In re Ashley E., 62 Conn. App. 307, 315,771 A.2d 160, cert. denied, 256 Conn. 910, 772 A.2d 601 (2001). "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [(Rev, to 1999) § 17a-112 (d) [now § 17a-112 (k)]." (Footnote omitted; internal quotation marks omitted.) In re Deana E.,61 Conn. App. 185, 190, 763 A.2d 37 (2000).
1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by achild-placing agency to facilitate the reunion of the child with theparent.
As discussed in part I, DCF timely offered services to the respondents that were tailored to the issues the brought Samantha into the care of DCF.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
As discussed in part I, DCF used reasonable efforts to reunite the family. CT Page 9002
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.
Both parents were issued substantially similar steps:
Keep all appointments set by or with DCF. Cooperate with DCF. Although the father may have been rude to DCF workers at times, and difficult to work with, the respondents substantially complied with this requirement.
Keep the child's whereabouts and you own whereabouts known to DCF, your attorney and the attorney for the child. The respondents substantially complied with this requirement, except that in late 2001, when the mother again left the father, she did not disclose where she had relocated.
Participate in individual and family counseling and make progress toward the identified treatment goals. The respondents complied with the requirement that they participate in counseling, at least through the year 2000. However, they made inadequate progress in stabilizing their own marriage. The mother made inadequate progress in becoming able to cope with the issues in her life. The father made inadequate progress in managing his anger. Whether the father continued in counseling in 2001 cannot be determined. Though he claimed to Dr. Meier to be in counseling in 2001, he declined to provide releases to DCF and did not submit reports from any therapists for that year.
Accept and cooperate with in-home support services referred by DCF. There is no evidence that such services were offered to the respondents, other than a parent aide in 1996 or 1997.
Cooperate with court ordered evaluations or testing. The respondents complied with this requirement.
Obtain and/or cooperate with a restraining/protective order and/or other appropriate safety plan as approved by DCF to avoid further domestic violence incidents as necessary. The respondents did not comply with this requirement. Although the mother obtained a protective order, she and the father consensually violated it to conceive a child, get married and live together.
Sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress toward identified goals, and for use in future proceedings in court. The respondents did not comply with this requirement. CT Page 9003
Secure and maintain adequate housing and legal income. The respondents complied with this requirement.
No substance abuse. The respondents complied with this requirement.
No further involvement with the criminal justice system. Cooperate with the Office of Adult Probation or parole officer and comply with conditions of probation or parole. The respondents complied with this requirement. Although the father may have been involved in incidents that brought him to the attention of the local police, the court does not, without more, construe this as "involvement with the criminal justice system." The father cooperated with the conditions of his probation.
Consistently and timely meet and address the child's physical, educational, medical, or emotional needs, including, but not limited to, keeping the child's appointments with her medical, psychological, psychiatric, or educational providers. Samantha spent many overnight visits with her parents in 2001-January 2002. They did not meet her emotional needs. The father continued his regime of yelling at the mother in Samantha's presence or within her hearing.
Immediately advise DCF of any changes in the composition of the household to ensure that the change does not compromise the health and safety of the child. The respondents did not immediately inform DCF when the mother left the home in November 2001. Otherwise, the respondents complied with this requirement.
Cooperate with the child's therapy. There is no evidence that the respondents did not comply with this requirement.
Visit the child as often as DCF permits. The respondents did not comply with this requirement in 1998 and 1999. Thereafter, they did so.
In addition, the mother was ordered to "demonstrate appropriate parent/child interaction during the visits." The mother complied with this requirement to the extent she was able to do so. However, as Dr. Meier observed, the mother showed "limited emotion or enthusiasm" in her interaction with Samantha.
4. Finding regarding the feelings and emotional ties of the child with respect to the child's parents, any guardian of the child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Samantha is bonded to her parents, although her relationship with her CT Page 9004 father is clearly troubled by the anger he has visited on the family. During 2001, Samantha was bonding well to her preadoptive foster parent.
5. Finding regarding the age of the child.
Samantha is six years old.
6. Finding regarding the efforts the parent has made to adjust such parent's circumstances, conduct or conditions to make it in the best interest of the child to return the child to the parent's home in the foreseeable future, including, but not limited to: (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent; provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Since late-1999 or early 2000, the respondents have consistently maintained contact with their daughter. They also maintained a good relationship with the foster mother with whom Samantha lived between January 2000 and April 2001. That foster parent permitted to respondents to visit with Samantha in her home. While in the home of this foster mother, the respondents comported themselves appropriately.
However, the respondents have clearly made insufficient progress in adjusting their circumstances, conduct and conditions to make it in the best interests of Samantha to return to them. The father is abusive to the mother, verbally if not physically, in Samantha's presence, continues to have an anger management problems, the respondents' marriage is unstable and the mother cannot cope with the problems complicating her life.
7. Finding regarding the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.
Neither parent has been prevented from maintaining a meaningful relationship with the Samantha by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by their economic circumstances.
 B.
Although in determining whether to grant a petition to terminate CT Page 9005 parental rights the court is statutorily mandated to consider seven factors; General Statutes (Rev. 1999) § 17a-112 (d), now § 17a-112
(k); In re Tyscheicka H., supra, 61 Conn. App. 26; "[t]he trial court is vested with broad discretion in determining what is in the child's best interests. . . . Conducting a best interest analysis is . . . purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203, 208,742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000). "The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Internal quotation marks omitted.) In re ShyinaB., supra, 58 Conn. App. 167.
Samantha has been in foster care for 4 ½ years, most of her life. Her parents have failed to rehabilitate to the extent that they can care for her emotional needs. Samantha is now in a preadoptive home and is bonding to her pre-adoptive parent. In that home her needs are being met; she feels safe and secure. Were she returned to the instability and upheaval of her parents' world, he behaviors would regress and her PTSD symptoms recur. There is no reason to delay such an adoption and further risk "[t]he well-known deleterious effects of prolonged temporary placement on the child. . . ." In re Juvenile Appeal (83-CD), 189 Conn. 276,292, 455 A.2d 1313 (1983). By clear and convincing evidence, the court finds that it is in Samantha's best interests that the respondents' parental rights be terminated.
 IV
The petition is granted as to both respondents. The court terminates the respondents' parental rights. The Commissioner of the Department of Children and Families is appointed statutory parent for Samantha for the purpose of securing a permanent adoptive family. The commissioner shall file with this court no later than 30 days following the date of this judgment a written progress report of efforts to effect such permanent placement and file further reports every three months thereafter, as required by state and federal law.
Dated at Middletown this 18th day of July, 2002.
 BY THE COURT Bruce L. Levin Judge of the Superior Court